**UNITED STATES of America**

v.

**Louis MARINO.**

**No. 90CR87.**

United States District Court,
N.D. Illinois, E.D.

July 28, 1993.

Mitchell Mars, David Buvinger, Asst. U.S. Attys., Chicago, IL, for plaintiff.

George N. Leighton, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

The jury found defendant Louis Marino guilty on Counts 1, 2, and 18 of the indict-

ment.[1] With respect to Count 1, the jury found Marino guilty of Unlawful Debts 2 and 5, and Racketeering Acts 5(a)-(b), 6–7, 9(a), 10(a)-(b), and 11(a)-(b).[2] The jury could not reach verdicts on Racketeering Acts 17(a)-(b), and Counts 8–9.[3]

This case is currently before the court on Marino's and the government's objections to the PSI, Marino's objection to the retroactive application of federal sentencing guidelines, and the government's motion for upward de-parture. For the reasons stated below, this court finds that Marino's total adjusted offense level is 43, his criminal history category is I and his guideline sentence is life in prison. Since none of the counts for which Marino was convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts to best effectuate this sentence. Given the length of this opinion, this court has provided an index.

*Index*

I. Background
 A. Overview of the Ferriola Street Crew's Illegal Activities
 1. Illegal Gambling Operations ..... 1506
 2. The Collection of Unlawful Debts ..... 1507
 3. Payoffs and Bribes ..... 1508
 4. Hal Smith's Murder ..... 1510
 B. Defendant Marino's Role in the Ferriola Street Crew ..... 1512
II. Objections to the PSI and the Government's Motion for Upward Departure
 A. Section 3C1.1: Obstruction of Justice
 1. Hal Smith's Murder ..... 1516
 2. Payment of Hush Money to Robert Covone ..... 1519
 3. Police Protection for Patrick Gervais ..... 1520
 B. Section 3B1.1(b): Crew Supervisor or Manager ..... 1522
 C. Section 5K2.0: Upward Departures ..... 1523
 1. Hal Smith's Murder ..... 1523
 2. Participation in Organized Crime ..... 1526
 3. Defendant's Ex Post Facto Objection to Upward Departures ..... 1527
 4. Summary ..... 1528
 D. Objections to Statements in the PSI
 1. Section 3E1.1: Acceptance of Responsibility ..... 1528
 2. Factual Inaccuracies in the PSI ..... 1529
 E. Base Offense Levels for Racketeering Acts 6, 9(a), and 10(a) ..... 1534
 F. Base Offense Levels for Racketeering Acts 11(a)-(b) ..... 1534
 G. Further Objections to Statements in the PSI ..... 1535
 H. Objections to the Government's Version of the Offense ..... 1535
 1. Extortion of Thomas Skryd ..... 1536
 2. Extension of a Juice Loan Bankroll to James Basile ..... 1537
 3. Other Objections to Statements in the Government's Version of the Offense ..... 1540
 I. Base Offense Level for Racketeering Act 10 ..... 1540
 J. Relevant Conduct ..... 1541
 1. Extension of Juice Loan Bankroll to Dominic Basso ..... 1541
 2. Extension of Juice Loan Bankroll to Mike Pascucci ..... 1541
 3. Extension of Juice Loan Bankroll to James Nicholas ..... 1542
 K. Summary ..... 1543

---

**1.** Count 1 charged Marino with racketeering conspiracy in violation of 18 U.S.C. § 1962, Count 2 charged him with illegal gambling conspiracy in violation of 18 U.S.C. § 371, and Count 18 charged him with submitting false and fraudulent tax returns in violation of 26 U.S.C. § 7206.

**2.** Unlawful Debts 2 and 5 charged Marino with the unlawful collection of money from Henry Erfurth and Steve Walton. Racketeering Acts 5(a)-(b) charged Marino with running illegal sports gambling and parlay card bookmaking operations. Racketeering Act 6 charged him with the extortion of Kenton Pielet. Racketeering Act 7 charged him with running an illegal casino gambling operation. And, Racketeering Acts 9(a), 10, and 11 charged Marino with the extortions of Ken Eto, Patrick Gervais, and George Miller, Jr.

**3.** Racketeering Acts 17(a)-(b) charged Marino with conspiring to murder and murdering Hal Smith. Counts 8–9 charged Marino with conspiring to murder and murdering Hal Smith.

## Background

### A. Overview of the Ferriola Street Crew's Illegal Activities

This case involves the illegal activities of one operating unit of the Chicago Outfit or mob known as the Ferriola Street Crew. This crew existed primarily to provide income to its members through: (1) the operation of various illegal gambling businesses such as sports bookmaking, parlay cards, and casino games, (2) the collection of "juice" or interest on usurious loans made by the crew, (3) the collection of "street tax" or money from individuals engaged in illegal or quasi-illegal businesses, and (4) the use of these proceeds in the criminal enterprise and other business ventures.[4] To conceal their actions, the crew also provided monetary payments to crew members who refused to testify against the crew, instructed potential grand jury witnesses to lie, and attempted to and bribed various police officers, judges, and other political officials.

From 1979 through the indictment in this case, the Ferriola Street Crew was involved in several illegal gambling businesses including a sports bookmaking business, two parlay card businesses from 1979 through 1983, floating blackjack games, and a casino. DeLaurentis also operated gambling rooms in 1982 and a floating dice game from 1986 through 1989 on behalf of the crew.

From 1976 through 1979, defendant William Jahoda operated a sports bookmaking business with Sam Sammarco. In early 1979, Jahoda told Sammarco that he wanted to switch to another bookmaking group and later told Sammarco that he would be working with Infelise. Shortly thereafter, Jahoda had several meetings with Infelise regarding setting up a bookmaking business. In the spring of 1979, Jahoda and representatives of the Ferriola Street crew agreed to form a bookmaking partnership by which profits would be split evenly between Jahoda, Infelise, and the crew. Jahoda was given responsibility for the day-to-day operation of the gambling operation including supervision of the wirerooms. Jahoda reported to Infelise on almost a daily basis regarding daily operations. This partnership continued until 1988 and generated profits of approximately $8 million.

In 1988, Jahoda was arrested twice for operating illegal blackjack games for the crew. As a result, Infelise replaced Jahoda with DeLaurentis, who became a partner and assumed responsibility for the day-to-day management of their gambling operation.[5] Defendant William DiDomenico acted as DeLaurentis' principal assistant. Jahoda remained involved in the business as a 50/50 bookmaker.[6]

Many other defendants were involved in the sports bookmaking business. For example, Bellavia was a collector and a supervisor for the operation. He also supervised the bookmaking activities of Freddie Braun. Marino started as an agent[7] and later became a collections supervisor. Marino also supervised the bookmaking activities of Homer Gonzalez for the crew. Michael Zitello acted, at various times, as an agent, 50/50 bookmaker, wireroom clerk, manager, and collector. Robert Covone, Ronald DeRosa, and Frank Maltese were agents, James Coniglio was a 50/50 bookmaker and a collector,

---

4. Not all defendants convicted in this case participated in each of the crew's illegal activities. Several were involved solely or primarily in the crew's gambling operation. However, each defendant benefited directly and financially from the crew's use of and reputation for violence. For example, competition against the crew's gambling operation was controlled by violence, threats of violence, and intimidation.

5. Prior to this appointment, DeLaurentis acted, at various times, as an agent, a collector, a 50/50 bookmaker, and a wireroom and collections supervisor for the crew.

6. 50/50 bookmakers provided the crew with players and agents, and shared equally in the profits and losses generated by their players and agents.

7. Agents controlled and directed bettors to the crew's gambling operation, and collected losses and paid winnings to their bettors for the crew. Agents received a commission of 25% of the net losses of their bettors.

James Nicholas was a 50/50 bookmaker, and Thomas McCandless and Robert Garrison were 50/50 bookmakers and wireroom clerks. Paul Spano permitted his business, Flash Interstate Delivery System, Inc. ("Flash Trucking") to be used as a meeting place and operations center for the business. He also kept money at Flash for use in the crew's bookmaking business.

From 1979 through 1983, the crew operated a parlay card business. This operation was initially operated by Infelise, Marino, DeLaurentis, Jahoda, and George Miller. During this time, parlay cards were distributed through agents. In the early 1980's, DeLaurentis attempted to take over all the parlay card businesses in Lake County, Illinois. During the business' later period, it was operated by Infelise, Jahoda, DeLaurentis, Michael Sarno, James Damopoulos, and others. Sarno provided the parlay cards for distribution.

From 1986 through 1988, the crew also operated a floating blackjack game managed by Jahoda under Infelise's supervision. Bellavia, Garrison, Nicholas, and Damopoulos acted as agents for this game. The blackjack games' net profits were split equally between Infelise, Jahoda, Ferriola, and Chuck Burge. The games were rigged through the use of professional card cheats and mirrored shoes. In total, approximately 24 floating blackjack games were held and nearly $1 million in profits was generated.

And, in the spring and summer of 1982, the crew operated a casino in a house in Libertyville, Illinois known as the Rouse House. The casino was managed by Jahoda under Infelise's supervision. The casino had rigged blackjack and craps games. Marino, DeLaurentis, McCandless, and Zitello worked at the casino, and DeLaurentis, McCandless, Zitello, and others provided players for the games. Casino profits were split equally between Infelise, Jahoda, Ferriola, and the crew. During its operation, the casino generated approximately $500,000 in profits.

The Ferriola Street Crew also collected unlawful debts, including gambling debts from losing bettors and interest and principal payments on juice loans. Interest on juice loans varied from 10% per month to 10% per week. Losing bettors who were unable to pay their gambling debts often were given juice loans for the balance of their gambling debts.[8] The crew also provided bankrolls to crew members and other from which to make juice loans and from which the crew received a percentage of the money obtained.[9]

Beginning in approximately 1974, the crew also sought to control all independent sports bookmaking businesses, particularly in northern Cook, Lake, and McHenry Counties, Illinois.[10] The crew forced independent bookmakers to either pay the crew a monthly street tax, make the crew a partner in their bookmaking business, or get out of the business. Partnerships were usually 50% partnerships by which the crew and the bookmaker would share profits and losses on a 50/50 basis.

In the late 1970's and early 1980's, the crew expanded this operation to include collecting street tax from houses of prostitution and adult book stores. During the early 1980's, the crew also attempted to take over independent parlay card gambling businesses and independent high stakes card games. Violence or the threat of violence was used

---

**8.** The crew collected unlawful debts from Curt Bullock, Henry Erfurth, Roy Salerno, Steve Walton, Les Perrelli, Angelo Parhas, Tony Belville, Edward Muisenga, Nick Gerodakis, James Wolf, Jack Duff, and Thomas Piccietti.

Parhas, Belville, and Gerodakis were given juice loans when they could not pay off their gambling debts. Covone arranged for Ed Muisenga to receive a juice loan from a non-crew member to pay off his gambling debt to the crew. Les Perelli and Nick Koritsaris received juice loans from DeLaurentis separate from any gambling debts. Undercover agent Larry Weeks also received a juice loan from Infelise and DeLaurentis to bribe a Wisconsin public official.

**9.** For example, Marino provided juice bankrolls to Mike Pascucci and Nicholas, and made juice loans to bookmaker Dominic Basso. Infelise and Marino provide a juice bankroll to James Basile and Sarno collected the crew's share from Basile each month. DeLaurentis also provided a juice bankroll to Damopoulos.

**10.** Independent bookmaking operations are those not affiliated with any street crew.

by crew members to maintain control over the independent operators.[11]

The Ferriola Street Crew also made great efforts to conceal their illegal activity. For example, the crew provided monetary payments to imprisoned members who refused to testify against the crew. During the grand jury investigation of this case, crew members Garrison, Nicholas, John Caulderullo, and Anthony Petronella, and street tax victim Chuck Cesario were subpoenaed to testify, asserted their Fifth Amendment privilege, were immunized, and still refused to testify before the grand jury. All five were ultimately incarcerated for civil contempt. While incarcerated, they received cash payments which were deducted from the crew's profits.[12] Crew members Jahoda, Harry Aleman, and Jerry Scalise also received cash payments from the crew during or after their imprisonment for various offenses.[13]

Crew members also instructed potential grand jury witnesses to lie. For example, DeLaurentis told street tax victim Gerry Otto to lie to the grand jury. Infelise and R.J. McDonnell joked about the "story" agent Navorat Boonpituk told to the grand jury. And, DeLaurentis and DiDomenico created a story for undercover agent Larry Weeks [14] to tell authorities if he was contacted regarding their Lake Geneva bribery scheme.

In addition, crew members attempted to and bribed police officers, judges, and other political officials to assure the acquittal of crew members indicted on criminal charges and for police protection for the crew's gambling operation.[15] For example, in 1977, Robert Cooley fixed a murder trial for Aleman. On Pat Marcy's instructions, Cooley paid $10,000 to presiding Judge Frank Wilson to fix the case.[16] Aleman was subsequently acquitted in a bench trial.

In 1981, Ken Eto made a series of monthly $1,000 payments to John Monteleone through Infelise and Marino. These payments were to buy police protection from the Vice Control Division of the Chicago Police Department for Eto's monte game.

In 1982, Pat Gervais paid a total of $12,000 to the crew for permission to operation his house of prostitution in Lake County, Illinois. DeLaurentis and Marino told Gervais that his $3,000 per month payment would take care of the crew and the Lake County Sheriff's Department, and that the sheriff's department would give him advance warning of any raids or investigations. Gervais received such a warning about a raid in March 1982.

Also in 1982, Infelise instructed Jahoda to give him $1,500 per month out of the Rouse House casino profits so that he could bribe the Lake County Sheriff to get advance notice of raids. Infelise told Jahoda that Ferriola had a contact in the sheriff's department and Infelise had a "hot phone" installed in the casino where the advance raid warnings would be received.

11. Victims of these extortionate activities included: Vince Rizza, Tony Reitinger, Steve Hospodar, Sam Sammarco, Pat Gervais, Phil Caliendo, Kenton Pielet, Jack O'Brien, Joe Ken Eto, Sam Malatia, Chuck Cesario, George Miller, Chuck Romano, Michael Adams, Greg DiPiero, Ed Cauley, Joseph Pascucci, Gerry Kurth, John Larsen, Dave Puhl, Robbie Hildebrandt, Hal Smith, Phil Janis, Bill Martino, Gerry Otto, Nick Koritsaris, Peter Aivaliotis, John Katris, Thomas Skryd, James Bollman, Robert Garrison, and Spiros Tzivas.

12. Nicholas, Caulderullo, and Petronella each receive $1,000 per month,. Covone received between $1,500 and $2,000 per month, and Cesario receive $500 per month. Nicholas also receive a $75,000 cash payment from DeLaurentis representing his share of the gambling profits earned by the crew during his imprisonment.

13. Jahoda's wife and girlfriend received monthly payments from Infelise, Marino, and DeLaurentis while he was imprisoned for federal income tax violations in 1980–1981. Aleman received a lump sum cash payment of $100,000 from Infelise after serving nearly 12 years in prison. Scalise received monthly payments from Infelise after his imprisonment in England for participating in a major jewel theft.

14. Larry Weeks was the street name used by undercover agent Larry Kaiser.

15. Police protection consisted of advance notice of police raids and arrests.

16. Marcy's role in the crew was to attempt to fix criminal cases against crew members and associates by arranging the reassignment of their cases to a corrupt Judge.

From 1982 through the fall of 1986, the Outfit and the Ferriola Street Crew also controlled the issuance of liquor licenses by Steve Bayovich, the Liquor Control Commissioner in Cicero, Illinois. This was originally accomplished through Bucky Ortenzi, but after Ortenzi's death in 1986, Infelise took over for him. In 1986, Infelise agreed to obtain a Cicero liquor license for a client of Robert J. McDonnell. During this period, monthly bribe payments were made to Bayovich.

In 1986, Infelise, through Pat Marcy and others, bribed his federal probation officer by finding the probation officer's son a job. The probation officer's son interviewed with Frank Maltese and Dino Marino, Louis Marino's son and a high ranking employee at the Town of Cicero Department of Public Works. The probation officer's son subsequently obtained a job in this department.

In 1987, DeLaurentis informed Jahoda that he paid $1,000 per month to the Forest Park Police Chief to protect the crew's floating craps game. Shortly thereafter, Infelise told Jahoda that the game had been moved to the Argo/Willow Springs area and that protection money was being paid there.

In 1988, Infelise told Jahoda that he had been giving $5,000 per month to Undersheriff of Cook County James Dvorak to be forwarded to the Cook County Sheriff for protection. In the fall of 1988, Infelise told Jahoda that this payoff had been increased to $10,000 per month. In September 1989, Infelise again confirmed to Jahoda that the crew was paying Dvorak monthly payoffs and that $35,000 in crew funds were being paid each month to incarcerated crew members and "the coppers."

In February 1988, Jahoda was arrested by the Illinois State Police for operating a blackjack game at the Arlington Hilton Hotel in Arlington, Illinois. From the time of his arrest through the fall of 1989, Jahoda had a series of conversations with Infelise, DeLaurentis, and Maltese regarding payoffs they were offering to three Cook County judges to fix Jahoda's case. Infelise told Jahoda that he believed something could be done to have the first judge on the case, Judge Christy Berkos, take care of Jahoda's case.

In the summer of 1988, Maltese told Infelise and Jahoda that he had met with Berkos and that Berkos was holding out for a trip for two to Hawaii. In early 1989, Berkos recused himself from the case. The second judge on the case, Judge Thomas Hett, recused himself during the summer of 1989. After Hett's recusal, Infelise told Jahoda that Maltese had met with Hett and that Hett would have been given $7,500 to take care of the case. Later, Infelise and DeLaurentis told Jahoda that the third judge assigned to his case, Judge Richard Neville, would be paid $10,000 to fix the case. According to Infelise, Pat Marcy was to handle it. The State eventually dismissed the case on its own motion.

In September 1989, Garrison wanted to run a regular high stakes poker game in Lake County, Illinois. DeLaurentis gave him permission to operate this game on the condition that Garrison pay the crew half of his profits and $250 per month for police protection.

Also in 1989, at DeLaurentis' request, Rocco Pellettiere attempted to make a payoff to DeLaurentis' former brother-in-law, Lake County Deputy Sheriff Willie Smith. Pellettiere offered Smith $500 per month for his approval to place DeLaurentis' joker poker machines in certain Lake County bars and early warning of any police raids on those bars. DeLaurentis later confirmed to Jahoda his belief that Smith had been bribed to permit them to operate illegal gambling activities in Lake County, Illinois.

Every Christmas, Infelise also instructed Jahoda to give him or DeLaurentis money from the bookmaking business to payoff various individuals in the Cook County Sheriff's Department. Upon DeLaurentis' demand, Lake County bookmaker Gerry Otto also paid $1,000 per year into this "Christmas fund." These payoffs ranged from $1,500–$5,000 per year.

Infelise, DeLaurentis, and Jahoda also engaged in a scheme with undercover agent Larry Weeks to bribe a local Wisconsin zoning official to gain favorable treatment in their efforts to get commercial/industrial property near Lake Geneva, Illinois zoned as residential property. This bribe was to be

financed by a $50,000 juice loan to Weeks from funds provided by Infelise, DeLaurentis, and Jahoda. At Infelise's direction, Jahoda obtained the $50,000 to give Weeks from money Spano kept for the crew at Flash Trucking. Jahoda then repaid Infelise for his and DeLaurentis' share of the juice loan. DiDomenico subsequently delivered DeLaurentis' share of the loan to reimburse Jahoda.

The Crew was also responsible for conspiring to murder independent bookmaker Hal Smith.[17] Since at least 1981, Smith was aware of the efforts of the Ferriola Street Crew, particularly Marino and DeLaurentis, to impose a street tax on independent bookmakers in Lake County or force them to become partners with the crew. Smith resisted these efforts. In March 1983, the IRS seized $600,000 in cash from Smith's home during a highly publicized raid. After this raid, the crew stepped up its efforts to gain control over Smith's bookmaking operation. For six months in 1983, Smith and his partners, Dave Puhl and Phil Janis, paid DeLaurentis $3,000 per month in street tax.

In the fall of 1983, DeLaurentis arranged a meeting with Janis and Robbie Hildebrandt, one of Smith and Janis' phone clerks. At this meeting, DeLaurentis told Janis and Hildebrandt that they and Smith would have to pay street tax. When Hildebrandt told Smith about the meeting, Smith said "fuck that little guinea" and told Hildebrandt that he would take care of it. Janis retired to Florida shortly thereafter.

In late February or early March 1984, DeLaurentis again contacted Hildebrandt about paying street tax. At a subsequent meeting, DeLaurentis told Hildebrandt and Smith that Smith had to pay $6,000 per month in street tax. Smith offered $3,000 and then $3,500, but DeLaurentis refused

these offers. Smith then said, "Now you get nothing." A very loud and public argument ensued in which Smith made numerous ethnic slurs about DeLaurentis. DeLaurentis told Hildebrandt that he was going to get a "slap" and told Smith that he was going to be "trunk music." According to the government, it was Smith's refusal to pay street tax which motivated members of the crew to conspire to kill him. The crew could not let the largest bookmaker in the area get away with not paying street tax and flaunting this fact publicly.

In the spring of 1984, Infelise asked Jahoda to show him where Smith lived. Thereafter, Infelise, Marino, and Bellavia went looking for Smith. Infelise asked Jahoda to set up meetings with Smith so that they could observe him. In the fall of 1984, Infelise instructed Jahoda to keep in contact with Smith.

On or about February 5, 1985, Infelise ordered Jahoda to bring Smith to Jahoda's house in Long Grove, Illinois. Jahoda arranged for Smith to meet him at a bar on February 7, 1985. Jahoda reported this arrangement to Infelise and told Infelise that he would try to get Smith to come back to his house with him.

On February 7, 1985, Infelise, Marino, and Bellavia came to Jahoda's house. Infelise told Jahoda that only he and Smith should come to his house, preferably in Smith's car, Smith should enter the house alone through the kitchen, and Jahoda should try not to go in the house. Later that day, Jahoda met Smith at the bar and brought him back to his house as instructed. Jahoda told Smith to go in through the kitchen while he pretended to go over to his mailbox. Jahoda saw Infelise, Marino, and Bellavia in the house after he arrived with Smith. The last time Jahoda

---

17. At trial, Infelise and Bellavia were found guilty of conspiring to murder Hal Smith under Racketeering Act 17(a). DeLaurentis was found not guilty on this count, and the jury could not reach a verdict on this count with respect to Marino and a mistrial was declared. Infelise, Bellavia, Marino, and DeLaurentis were also charged with murdering Hal Smith under Racketeering Act 17(b). The jury could not reach a verdict on this racketeering act for any of these defendants and a mistrial was declared.

Infelise, Bellavia, Marino, and DeLaurentis were also charged with conspiring to murder and murdering Hal Smith in Counts 8 and 9. The jury found DeLaurentis guilty on Count 8, but this conviction was vacated by this court and a mistrial declared on December 30, 1992. The jury could not reach a verdict on Count 8 with respect to Infelise, Bellavia, and Marino. The jury also could not reach a verdict on Count 9 with respect to Infelise, Bellavia, Marino, and DeLaurentis.

saw Smith, he was dazed and slumped on the floor with Infelise, Marino, and Bellavia surrounding him.

Later that evening, Jahoda returned home and found his house empty. Jahoda noticed that part of the kitchen floor had been mopped. Infelise then called Jahoda and told him to look for a cigar and glasses which Marino thought had been left behind. Jahoda looked for these items but could not find them. Both items were later recovered from Smith's car by the Arlington Heights Police. Jahoda left for Mexico the next day.

Smith's body was found in the trunk of his car on February 10, 1985. The coroner who examined Smith's body concluded that Smith died of strangulation. The coroner also found that Smith had been tortured because Smith had been severely beaten about the head and face, he had numerous superficial incisions and cuts in his neck and chest, and his throat was slit. None of these cuts were fatal.

While in Mexico, Jahoda received a phone call from Infelise who told him that Smith's body had been found. After Jahoda returned from Mexico, he met with Infelise. Infelise told him that they were all "hot" because of "that thing," and Jahoda was particularly hot. Infelise commented that the murder of Chuckie English was a good distraction and would take the heat off the Smith murder. In subsequent conversations, Infelise told Jahoda that Smith was a snitch and Ferriola wanted to thank him for "that Smith thing."

While working as a government informant, Jahoda obtained consensually recorded conversations with Infelise and Bellavia regarding Smith's murder. Jahoda told them that "Officer Friendly," an alleged corrupt police officer, had passed on bits of information about the Smith murder investigation to him. On October 25, 1989, Jahoda showed Infelise a list of clues supposedly gathered by the police regarding the murder, including cigarette evidence left at the crime scene and a reference to the route the police believed Smith's car took the night he was murdered.

After reading the list, Infelise stated: "when you tell me something like this, you think I could go home and sleep, without having this information? It might not be important to you, but maybe I know more than you do. Do you understand, you know?" Infelise also questioned the accuracy of the police notes on Smith's car. He stated: "The car, right? It come from there to your house. It went all the way to mother fuckin' Arlington Heights. That's where they found the car. So how could the speedometer only have three miles on it." Government Exhibit 453.

In an October 30, 1989 consensually recorded conversation, Bellavia and Jahoda also discussed the Smith murder. Jahoda discussed his concern that little clues might have been inadvertently left which would trace the murder to them:

Jahoda: Here's a fucking success. I just want to point out an error or two. He should never have picked up that phone. The biggest break we got is the next day. I don't know if he told you this. Cook County's all over my house. I'm already turned in as, as a missing person.

Bellavia: Yeah.

Jahoda: I got a guy in the house that won't let them in.

Bellavia: Yeah.

Jahoda: And who knows what the hell was in there?

Bellavia: Yeah.

Jahoda: Whoever brought the, the, the rope. I mean, I know everybody's got gloves. What the fuck? But when that rope was bought, it wasn't bought with gloves on. The fucking bag was there. The wrapper was there. The receipt was there. True Value Hardware or whatever. I mean, I, you know, it's just the little things. (Inaudible).

Bellavia: Yeah, right. Them are the little things that, ah

. . . . .

Jahoda: You know, who, whoever, did the floor leaves the fucking mop. You got to make sure that you use gloves, if, if I don't come home that night. If I catch that plane in the morning, which I almost did. I almost stayed at a broad's house.

Bellavia: Yeah.

Jahoda: Cuz I had my luggage. I almost never went home. So fortunately I was there to tidy up.

Bellavia: There's things that you can be, there's things you can be so careful about, and yet there's little, little things.

Jahoda: Cuz I know that, that there was either, you know, I don't wanna know where it came from, you know, Bobby Salerno or yourself. Just, just learn from our successes.

Bellavia: That's right. That's right.

Government Exhibit 457 at 16–17. Jahoda and Bellavia also discussed Smith's murder on another occasion:

Jahoda: I mean I'm talking about the period. He just never told me a God damn thing.

Bellavia: Well, as a rule they should, but they don't, you know. When a guy's got bones.

Jahoda: He drove me back to the tavern and said, "Burn your clothes and leave. He doesn't say how long you guys are going to be [at Jahoda's house with Smith] or where's he's going.

Bellavia: Yeah.

Jahoda: You know what I mean? Like, I know, that, that guy [Smith] ain't' there to buy tickets to the, to the Knights of Columbus Smoker.

Bellavia: (Laughs).

Jahoda: But in my wildest dreams, I don't picture him getting fucking sliced and diced in the kitchen, either.

Government Exhibit 457 at 20–21. In a subsequent discussion, Bellavia further assured Jahoda that Smith was only in the kitchen so he did not have to worry about evidence turning up in another room of Jahoda's house. Jahoda asked: "Except I just want to know one thing. Was that, that guy any place but that kitchen? He never left the kitchen." Bellavia told him "No." When Jahoda stated: "So, all I know is I sterilized that kitchen, but I never went past that kitchen. Kitchen and that side bathroom," Bellavia again responded: "No, that's all. That was it." Government Exhibit 457 at 32–34.

## B. *Defendant Marino's Role in the Ferriola Street Crew*

Marino began his involvement with the Ferriola Street Crew as a bookmaker and a strong-arm collector. During the time the crew was managed by Infelise, Marino's responsibilities increased until he became a crew supervisor, serving directly under Infelise before and after Infelise became the crew boss. In addition to his collections responsibilities, Marino supervised other bookmakers, including Homer Gonzalez, and, at times, handled the bankroll for the bookmaking and juice loan operations. Marino provided juice loan bankrolls to Nicholas, Michael Pascucci, and James "Duke" Basile, and extended juice loans, most notably to bookmaker Dominic Basso.

Marino also supervised various aspects of the crew's gambling operation. For example, Marino supervised the distribution of parlay cards. Sam Malatia testified that in 1980, DeLaurentis hired him to distribute parlay cards. He occasionally received the cards from Marino at Marino's home. After the games were completed, Malatia would report the winners and losers on the cards to Marino or DeLaurentis. While he generally received the money to pay off winning players from DeLaurentis, Malatia testified that on one occasion he received the money from Marino.

On November 13, 1983, federal agents searched Marino's home and found voluminous parlay card stubs with parlay car agents' notations on them. According to the government, this discovery demonstrates that Marino's home was used as a clearing house for the crew's parlay card operation. Federal agents also found "master" parlay card stubs at Marino's house, with the winning and losing teams for each game indicated by being circled. According to the government, such master card stubs would only be used by someone figuring out the winning and losing bets for a parlay card wager. The master parlay card stubs found in Marino's home were in sequence with an identical master parlay card stub found on the same date at Infelise's home.

Marino also supervised the crew's casino in Libertyville, Illinois. Jahoda and Charles

Burge, a card cheat who worked at the casino, testified at trial that Marino had responsibilities in the casino's cage, where the chips were sold to players. Marino was also in charge of the casino's security and spent time outside the casino watching for law enforcement.

In recorded conversations with Jahoda in 1989, Infelise, DeLaurentis, and Nicholas indicated that as of that year, Marino supervised Nicholas' wagering activities, at least with respect to the floating blackjack games Nicholas was operating in Greek Town. Marino also provided a juice loan bankroll to Nicholas so that Nicholas could make juice loans to his customers.

Because of his supervisory position, Marino was considered by the crew to be one of the persons capable of keeping the crew's illegal businesses going in the event that other crew bosses went to jail. The following consensually recorded conversation between Jahoda and DeLaurentis took place:

DeLaurentis: Sure. What the fuck? You know, I'm going to try and keep this thing going. Let's say they scoop [arrest] us. I'm putting guys in now to keep this fucking thing going. One thing is going to jail and you still got everything going, and you know that, like you did last time.

Jahoda: Oh yeah.

DeLaurentis: That's another thing to go we're all closed up, you know. So I'll try to get a couple of guys in line nobody's home, B. You know, either me or Rocky [Infelise] or Louie [Marino], one of us, it will be a lot better if one of us is out on the street.

Jahoda: True.

DeLaurentis: If we're all gone, then the guys behind us. We might lose a little money, somebody might steal a little along the way, but we still got it going.

Government Exhibit 447 at 14–15.

In addition, pursuant to Infelise's order, troublesome accounts were given to Marino and DeLaurentis for collection. Marino would often use strong-arm tactics in making these collections. In 1981, bookmaker Steve Hospodar lost approximately $12,000 when his bettors refused to pay him. Hospodar was responsible to the crew for the debt, but did not have the money to pay it. Hospodar recorded several conversations he had with Infelise, Marino, and DeLaurentis about the $12,000 debt. On February 6, 1981, Hospodar taped a conversation he had with Marino and DeLaurentis at a restaurant about the money he owed. In part, the following discussion took place:

Marino: (Inaudible) ... He got any money today?

DeLaurentis: He ain't got nothin', nothin'.

Marino: Nothin' ... You motherfucker, I wish this was real, you motherfucker, I'll give ya' it right here ya' dirty mother, come on [at this point in the conversation, Marino picked a knife up off the table and stuck it in Hospodar's ribs].

\*　　\*　　\*　　\*　　\*　　\*

Marino: What do you got, motherfucker, jewelry anythin' you got, I want ever mother ...

Hospodar: Here ...

Marino: ... fucker thing you got (Inaudible) ...

Hospodar: This is all I got with me now. Here's a bond that I'm pinched. It's a hundred dollar bond.

DeLaurentis: what's this?

Hospodar: That's ah, a guy made a payment.

Marino: Hold this.

Hospodar: That's all, what the hell, I don't ...

Marino: where the fuck is this money comin' from?

Hospodar: Lou, I ain't got nothin'. I got nothin' at all.

Marino: Hey, you took a shot at me, you motherfucker.

Hospodar: Well here.

Marino: What do I look like, a fuckin' nitwit!

Hospodar: No, no, no, no, I told him I got a buyer for the lot. Let me try and sell the goddam lot!

Marino: Wait, wait, tell me I'm gonna wait until you sell the fuckin' lot?

Hospodar: Well ...

Marino: Who the hell, what do I look like?

Hospodar: Believe me.

Marino: I want this motherfuck, I don't give a fuck where you find it, I want this motherfuckin' money. I want money tonight! You hear what I'm tellin' you. I want money tonight, you motherfucker!

\* \* \* \* \* \*

Marino: ... And I mean what I'm tellin' ya'. And don't go hide you motherfucker, you can't hide ...

Hospodar: I won't hide.

Marino: You can't fuckin' hide nowhere.

\* \* \* \* \* \*

Hospodar: I never hide from anybody Lou.

Marino: I'll put it, I'll be goin' to sleep with you at night, and you will bring fuckin' money tonight! You hear what the fuck I'm telling you?

\* \* \* \* \* \*

Marino: Now I don't have to tell ya' what the fuck is this, how serious this is. Now you hear what I'm tellin' ya'? Ya' hear what I'm tellin' ya?

Hospodar: I hear ya'.

Marino: 'Cause I'm gonna be in your house, on your doorstep, I'll shake every motherfuckin' thing down in there.

Hospodar: All right.

Marino: And don't think that I ain't fuckin' capable. And don't call nobody ...

Government Exhibit 304.[18]

Zitello and Marino confronted another bettor, Ray Cavanaugh, at the Board of Trade where Cavanaugh worked regarding Cavanaugh's betting account. Bettor Burt Goldstein, who saw the confrontation, told Jahoda that he thought Marino was going to throw Cavanaugh over a balcony. Cavanaugh paid off his debt after Zitello's and Marino's physical confrontation with Cavanaugh.

In 1982, a delinquent bettor who owned a race horse named "Corleone," owed Miller approximately $9,000 in gambling debts. Miller turned the collection over to Jahoda who turned it over to Infelise and Marino. Infelise, Marino, and Jahoda had a meeting with the bettor during which Marino physically braced the bettor against a wall. On the night of the confrontation he was to point out the bettor and walk away. After he pointed out the bettor, Miller heard screams coming from the bettor's direction as he walked into the hotel bar. Jahoda later told Miller that they had turned the bettor upside down and Marino took money from the bettor's wallet.

Marino was involved in the intimidation of Kenton Pielet. Pielet acted as a 50/50 bookmaker for the crew starting in the summer of 1979 and as a 25% agent during the basketball season of 1980. During the football season of 1979, Pielet had approximately 50 betting football customers who lost approximately $102,000. One of Pielet's bettors, Larry Holler, lost $26,000 in one week. After there were difficulties in collecting Holler's debt and Holler indicated that he was going to refuse to pay, a meeting was set up between Holler, Pielet, Marino, and Zitello. Holler paid off the $26,000 at this meeting.

Holler was permitted to continue betting during the basketball season of 1980 and ultimately lost over $13,000. After Holler did not pay off his debt, a meeting was set up between Pielet, Infelise, and Marino. At this meeting, Pielet told Infelise and Marino that he tried to collect Holler's debt, but that Holler did not have the money. Infelise told Pielet that he was responsible for Holler's debt. When Pielet laughed at this suggestion, Marino slapped him across the face. Infelise then told Pielet that he would have to collect the debt and pay $500 per month in street tax. Pielet then agreed to make the street tax payments because the slap by Marino scared him. Pielet later switched to another street crew run by Sam Carlisi. This change in crew membership only occurred after Pielet obtained permission to switch and Holler's $13,000 debt was resolved.

---

18. In 1984, Infelise, Marino, and DeLaurentis were tried and acquitted for Hospodar's extortion.

Marino was also involved in the intimidation and extortion of Patrick Gervais. Before becoming involved with the Ferriola Street Crew, Gervais had a street tax relationship with Victor Spilotro, a boss from another crew. But, within a week of opening a house of prostitution in Lake County, Illinois, Gervais received a phone call from DeLaurentis advising him that he would have to pay a $3,000 per month street tax to the Ferriola Street Crew. When Gervais spoke with Spilotro about the phone call, Spilotro told Gervais not to pay DeLaurentis because "he had the muscle." Marino then set up a meeting with Gervais which Spilotro also attended. When Marino and Infelise showed up for the meeting, Spilotro looked surprised to see Infelise. After Spilotro and Infelise had a brief, private discussion, Spilotro told Gervais that "I am out" and that Gervais' house of prostitution was "in their territory." Spilotro also told Gervais that he would have to deal with Marino and Marino commented, "that's right, that's ours." After Infelise's intercession, Gervais began paying street tax to the Ferriola Street Crew. Gervais paid a total of $12,000 to the crew to protect his Lake County house of prostitution.

Marino was also involved in the intimidation and extortion of George Miller, Jr. Miller was an independent bookmaker who worked with bookmaker Hal Smith during the late 1970's. In 1980 or 1981, Miller broke away from Smith and began working as an independent bookmaker in Lake County with his father George Miller, Sr. The Millers also ran a lucrative parlay card business during this time. In 1982, Infelise, Marino, and DeLaurentis decided to take over the Millers' operation. A meeting was arranged between the Millers, Infelise, Marino, and DeLaurentis. At the meeting, Marino told the Millers that they had to split their business with them. If they did not join the crew, Infelise told them that they would smash their parlay card printing press. Marino further told them, "We are taking over Lake County. There are only two crews in Lake County, Posner and us."

After this meeting, the Millers discussed their situation with other bookmakers and

learned about DeLaurentis' reputation as a mob enforcer. At a second meeting with Infelise, Marino, and DeLaurentis, George Miller Jr. told them that he would join the crew's business. Infelise, Marino, and DeLaurentis subsequently took over the Millers' business on a 50/50 basis and employed Miller in one of their wire rooms. In 1982, the crew received $75,000 for their 50% interest. After 1982, Miller basically got out of the parlay card business, but DeLaurentis warned him that if he ever got back into parlay cards again, it had "better be with us."

Marino also collected payments from Roy Salerno. In the summer of 1983, Salerno, one of George Miller's bettors, lost $100,000 in baseball wagers to Miller. Miller eventually turned the debt over to Jahoda who in turn advised Infelise about the debt. Infelise told Salerno that he would have to make monthly payments of $1,500 until the debt was paid off. Marino, DeLaurentis, and later, Bellavia collected these payments from Salerno for several years until Infelise "cashed out" the debt for approximately $10,000–$15,000. Miller did not receive any of the money collected by the crew.

Marino was also involved in the intimidation of Ken Eto. Eto had been in the gambling business in one form or another since the late 1950's and had paid street tax to outfit bosses during this time. Eto was introduced to Infelise in the late 1950's or early 1960's by Turk Turello. In 1980, Eto was interested in opening and sought permission from Ferriola to open a Bolita game,[19] but, if he failed to get permission before opening a game, he could very well get hurt. Ferriola consulted with Vince Solano, Eto's boss from the Rush Street Crew, and they decided that Eto would be required to pay $5,000 per month starting in May 1980 to operate the game. Solano told Eto to pay the street tax directly to Infelise. After that meeting, Eto met Infelise and Marino monthly to pay them $5,000 until February 1982. In total, Eto paid Infelise and Marino approximately $100,000 in street tax.

19. Bolita is a Puerto Rican numbers game.

Eto also paid Infelise and Marino protection money, which was to be passed on to John Monteleone, for a Monte game. In the fall of 1981, Infelise gave Eto permission to move the game to Lake County because of the heat it was getting, but Eto declined because Lake County was too far. Eto also had a bookmaking partnership with Joe Borsellino. In early 1982, Infelise took Borsellino's business away from him because Borsellino owed him $20,000. Infelise permitted Eto to maintain his interest in the business and gave Eto a betting line. In late 1982, Eto made arrangements for two independent bookmakers to meet Infelise and Marino to receive a betting line and a number to call for their action. And, in late 1981, Eto sought Infelise's permission to open a strip joint. Infelise told Eto that he could not open the strip joint because his intended location was "sacred territory." According to Infelise, the refusal was not coming from him, but straight from the "old man." [20]

Marino was also involved in the intimidation and extortion of Thomas Skryd,[21] an attorney who pleaded guilty to tax violations and agreed, pursuant to his plea agreement to cooperate with the government. In approximately March 1984, Skryd and his wife purchased a tavern called "TJ's Pub" in Lyons, Illinois and managed by Ken Kreble. During the first year of Skryd's ownership, a money stakes poker game was played in the rear of the tavern. After he had owned the bar for some time, he was advised that the Outfit did not like the fact that he had a poker game at his tavern. Skryd was then introduced to Marino who he knew to be a member of the Chicago Outfit associated with Infelise and moving up in the ranks of the Outfit. When they met, Marino told Skryd that he had heard about Skryd's poker game. When Skryd told him it was just a neighborhood game, Marino replied: "you're in our business." Marino told Skryd that something could be worked out and to go ahead with the game. Marino said he would see Skryd once a month but he did not know what to charge Skryd because he did not

know how much the poker game was worth. Skryd was to tell Marino what he thought it was worth and what payoff seemed fair, and Marino would see how well the game did and adjust the payments accordingly.

Marino also told Skryd not to worry about the card game because "we" have inside information and could warn him about police raids before they occurred. Marino said that there were other games in the same area as Skryd's bar and that he could not let Skryd get away without paying because then the other card game operators would complain. Marino further told Skryd that while attorney Bob Stevenson did some of "their" legal work, he could throw some syndicated gambling cases to Skryd.

After meeting with Marino, Skryd told his manager to stop the game. Skryd stopped the card game because he was not charging for it and therefore did not make money which warranted making monthly payments to Marino. Skryd did not want to have any dealings with Marino since he knew Marino was associated with the Outfit and Skryd was afraid of having any dealing or trouble with it. Skryd never considered continuing the card game without paying Marino. After shutting down the game, Skryd had not further contact with Marino.

Finally, as described in detail above, Infelise, Bellavia, and Marino were involved in the conspiracy to murder Hal Smith.

### The Objections To The PSI And The Government's Motion For Upward Departure

#### A. Section 3C1.1: Obstruction of Justice

#### 1. Hal Smith's Murder

The probation officer assigned Marino a total adjusted offense level of 28. The government objects to this determination, claiming that Marino's total adjusted offense level should be 29 because Marino should receive an enhancement pursuant to Section 3C1.1 for obstruction of justice.[22] The government

---

**20.** Jahoda testified that the "old man" was Joseph Aiuppa.

**21.** Evidence of this charge was not presented at trial and the jury did not consider this charge against Marino.

**22.** Section 3C1.1 provides:

contends that a Section 3C1.1 enhancement is warranted because Hal Smith's murder was motivated, in part, by the belief that Smith was a snitch. Since the government claims that sufficient evidence has been presented to warrant considering Smith's murder at sentencing and the murder of an informant constitutes obstruction of justice, the government argues that Marino should receive a Section 3C1.1 enhancement.

██ The determination of whether Marino should receive a Section 3C1.1 enhancement depends upon a finding that Marino should be held accountable for Hal Smith's death. When reviewing evidence at sentencing, the Seventh Circuit has clearly established that it is appropriate to apply the preponderance of the evidence standard. *See United States v. Masters*, 978 F.2d 281, 286–87 (7th Cir. 1992); *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir.1991). Based upon this court's careful review of the evidence presented regarding Hal Smith's murder, this court is persuaded that the government has shown by a preponderance of the evidence that Marino should be held accountable for Hal Smith's death.

As thoroughly explained in the background section of this opinion, Jahoda testified extensively about the stalking and murder of Hal Smith. Jahoda testified that Smith refused to pay the street tax the crew demanded and this refusal motivated crew members to conspire to murder Smith.

Jahoda also testified that, as arranged during a prior meeting between Jahoda, Marino, Infelise and Bellavia, Jahoda brought Smith to his house on February 7, 1985 and left him there with Infelise, Bellavia, and Marino. Jahoda last saw Smith dazed and slumped on the kitchen floor with Infelise, Bellavia, and Marino standing over him. When Jahoda returned home later that evening, he noticed that part of the kitchen floor had been mopped. Smith's body was found in the trunk of his car three days later, on February 10, 1985.

This court has already determined that sufficient evidence has been presented to prove by a preponderance of the evidence that Infelise and Bellavia participated in Smith's murder.[23] Jahoda clearly identified Infelise and Bellavia as participating in the stalk and murder of Hal Smith and this court finds Jahoda to be credible. During the trial, Jahoda was on the witness stand for approximately 4–5 weeks, testifying regarding illegal acts committed by Ferriola Street Crew members. On many occasions, Jahoda's testimony was corroborated by other witnesses and tape recorded conversations. *See, e.g., United States v. Infelise*, 835 F.Supp. 1466 (N.D.Ill.1993); *United States v. Maltese*, 90 CR 87–19, 1993 WL 222350 (N.D.Ill. June 18, 1993); *United States v. Zitello*, 90 CR 87–11, 1993 WL 62394 (N.D.Ill. Feb. 17, 1993); *United States v. Aleman*, 9 CR 87–12, 1992 WL 390912 (N.D.Ill. Dec. 16, 1992). This court had the opportunity to view this witness and his cross-examination, and finds his testimony to be credible.

██ It is clear that this court can rely on Jahoda's testimony alone in meeting the preponderance standard that is applicable here. Indeed, the uncorroborated testimony of a co-conspirator can be relied upon when finding beyond a reasonable doubt that a defendant is guilty of a crime. *See United States v. Byerley*, 999 F.2d 231 (7th Cir. July 13, 1993); *United States v. Trujillo*, 959 F.2d 1377 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992). In the instant case the court has relied not only on Jahoda's testimony but corroboration by tape-recorded conversations or other evidence regarding details of the murder.

For example, in an October 25, 1989 conversation, after showing Infelise a list of

---

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels. The addition of this enhancement would bring Marino's highest offense level, the offense level for the intimidation and attempted extortion or extortion of Patrick Gervais as charged in Racketeering Acts 10(a)-(b), up to 24. With the addition of 5 unitizing points pursuant to Section 3D1.4, Marino's total adjusted offense level would be 29.

23. *See United States v. Infelise*, 835 F.Supp. 1466 (N.D.Ill.1993).

clues allegedly gathered by the police, Infelise questioned the accuracy of the police's information about Smith's car. Infelise said: "The car, right? It comes from there to your house. It went all the way to mother fuckin' Arlington Heights. That's where they found the car. So how could the speedometer only have three miles on it." Government Exhibit 453.

Bellavia also discussed details of the murder with Jahoda in an October 30, 1989 conversation:

Jahoda: Whoever brought the, the, the rope. I mean, I know everybody's got gloves. What the fuck? But when that rope was bought, it wasn't bought with gloves on. The fucking bag was there. The wrapper was there. The receipt was there. True Value Hardware or whatever. I mean, I, you know, it's just the little things.

Bellavia: Yeah, right. Them are the little things that, ah

. . . . .

Jahoda: You know, who, whoever did the floor leaves the fucking mop. You got to make sure that you use gloves, if, if I don't come home that night. If I catch that plane in the morning, which I almost did. I almost stayed at a broad's house.

Bellavia: Yeah.

Jahoda: Cuz I had my luggage. I almost never went home. So fortunately I was there to tidy up.

Bellavia: There's things that you can be, there's things you can be so careful about, and yet there's little, little things.

Government Exhibit 457 at 16–17. In a subsequent conversation, Bellavia also assured Jahoda that Smith was only in the kitchen on the night of his murder. Jahoda asked: "Except I just want to know one thing. Was that, that guy any place but that kitchen? He never left the kitchen?" Bellavia told him "No." When Jahoda stated: "So, all I know is I sterilized that kitchen, but I never went past that kitchen. Kitchen and that side bathroom," Bellavia again responded: "No, that's all. That was it." Government Exhibit 457 at 32–34. This evidence clearly places Infelise and Bellavia as participants in

Smith's murder because only individuals with intimate knowledge of the crime would be able to discuss the murder in such detail.

Jahoda also identified Marino as participating in the stalking and murder of Hal Smith. Indeed, Jahoda testified that he last saw Smith slumped on the kitchen floor, with Infelise, Bellavia, and Marino standing over him. Jahoda further testified that he received a phone call from Infelise on the night of the murder because Marino thought evidence, either substantiated Smith's glasses or a cigar, had been left behind at Jahoda's house. Significantly, cigars and Smith's glasses were recovered from Smith's car when his body was discovered in the trunk of the vehicle. Jahoda's testimony is further substantiated by this October 30, 1989 taped conversation between Bellavia and Jahoda:

Jahoda: ... Rocky called me that fucking night.

Bellavia: Mmm hmm.

Jahoda: That phone should have been bad. He called my house, I'm telling you, after I got home. Now this is six months after the G raids my house. This is six months before all them fucking phones out there are tapped.

Bellavia: Ah huh.

Jahoda: He calls me that night. And, and says, Louie thinks the guy lost either glasses or a cigar. I forget which, do you remember? Did he say?

Bellavia: Yeah, it was, it was important enough to make a phone call.

Jahoda: He should have sent somebody.

Bellavia: I would have drove, if he'd a told me, I would of went out there.

Jahoda: He should have sent somebody.

Bellavia: Yeah, I agree.

Jahoda: I mean, I know Louie's clean because there's a million Louie's, he didn't say, Louie you know, Marino.

Bellavia: Yeah.

Jahoda: But, he says Louie even on tape. My voice is on tape. And I'm in this fucking house. And I'm cleaning this fucking house when he calls. I mean, not that it was a slaughterhouse, it wasn't. Don't misunderstand me.

Bellavia: Yeah. No, no, I know.

Jahoda: I knew that nobody was (Inaudible).

Bellavia: But nothing ever come from it.

Jahoda: No, well, that was one more thing ... that was close ...

Government Exhibit 457 at 15–16.

This recorded conversation clearly implicates Marino in Smith's murder. In the conversation, Bellavia obviously understands what Jahoda is talking about when Jahoda says that Marino thought incriminating evidence was left at the scene of the crime. And Bellavia, an individual who has demonstrated intimate knowledge about Smith's murder, does not question Jahoda or protest in any way when Jahoda indicates that Marino was present at the scene of the crime.

Additional support for this court's determination that Marino participated in Smith's murder is provided by the following November 2, 1989 conversation in which Jahoda and Salerno refer to Marino's concern that evidence had been left behind at the crime scene:

Jahoda: I don't know if you're aware of this, Louie and Rocky and myself got subpoenas.

Salerno: Subpoenas?

Jahoda: To go a week from today ...

Salerno: Let me see this, wait ...

 \* \* \* \* \* \*

Jahoda: And we know what this is.

Salerno: Yeah.

Jahoda: And we're not worried about it. But I don't think you know this, so I want you to, I want you to know what it involves. Rocky made a very serious mistake that night. He called me from the outside. He told me that Louie had left something there ...

Salerno: Yeah, don't even talk about it.

Jahoda: No, I understand that. So, but, but it was picked up on a tape. So that's why the three of us ...

Salerno: Don't even, don't even, don't even tell me about it. They ain't got shit.

Jahoda: I know that, but he wanted you to know.

Government Exhibit 459 at 3.

In sum, not only did Jahoda testify under oath that he saw Marino stalk and prepare to murder Smith, but Bellavia, Marino's co-conspirator who has demonstrated an intimate knowledge of the murder and whom this court has found responsible for Smith's death, acknowledged that Marino was concerned about leaving incriminating evidence at the scene of the crime. And, the two items Marino was concerned were left at the crime scene were found by the police in Smith's car. Such evidence is sufficient to prove by a preponderance of the evidence that Marino participated in Hal Smith's murder. Therefore, despite Marino's denials, this court finds that Smith's death can be considered for sentencing purposes.

■ Having determined that there is sufficient evidence demonstrating that Marino participated in Hal Smith's murder, this court must now determine whether an obstruction of justice enhancement is warranted. As this court explained in its June 25, 1993 opinion regarding Infelise's and Bellavia's objections to their PSI's, this court is not persuaded that Smith was murdered in an effort to obstruct the government's investigation of the Ferriola Street Crew. The only evidence supporting the government's claim is Infelise's statement to Jahoda, after Smith's body was found, that Smith was a "snitch." No evidence has been presented which shows that crew members knew Smith was a government informant before Smith's death or that Smith was killed because he was a government informant. Therefore, this court finds that Smith's murder does not provide a proper basis for assessing Marino an enhancement pursuant to Section 3C1.1.

### 2. Payment of Hush Money to Robert Covone

■ An obstruction of justice enhancement is warranted, however, based on Marino's involvement in paying hush money to crew member Robert Covone. As this court explained in the background section of this opinion, the crew regularly paid hush money to employees when they refused to testify

before the grand jury about crew activities, despite having been granted immunity, and were jailed for contempt. In 1989, Covone was jailed for contempt when he refused to testify about the crew before the grand jury. Marino directly participated in paying Covone hush money while he was in jail by relaying Covone's request for money to Infelise. In a recorded conversation between Jahoda and crew member Edward Stevenson, Stevenson discussed paying Covone:

> Stevenson: This, his wife got a hold of me, Bobby's wife.
>
> Jahoda: Yeah, Covone.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Stevenson: Yeah, right, so anyway, she [Covone's wife] told me that he paid a bill and he left her and number one she needs 2,000 a month, ok?
>
> Jahoda: Ok.
>
> Stevenson: So, I talked to our pally [Infelise] last night, that's ok. Here's what happened originally. That's why Solly was going to call you. When I talked to her, last time I talked to Bobby [Covone], he told me, he said he had bills. He showed me the bills. He said they were 1,500 and something. He said that the bills were really 1,700, he says, but I don't want to be a mooch, you know, with B.J. So I happen to say to Louie [Marino], I said, you know, the kid says he don't want to be a mooch. I don't know, the broad got a little baby, this and that. In the meantime, this is prior, so evidently he must have told Rocky Friday night at Gabeet's wedding, right? Did you go to the wedding?
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Stevenson: ... Alright. So evidently he must have told Solly to get a hold of you and tell you about this 1,700, so when I went to his house last night ...
>
> Jahoda: I'm missing the link though.
>
> Stevenson: Yeah.
>
> Jahoda: Oh, you told, you told Rocky.
>
> Stevenson: I told Louie.
>
> Jahoda: You told Louie.
>
> Stevenson: Who in turn told Rocky. Alright?
>
> Jahoda: Ok.

> Stevenson: So I went last night. He said, what the fuck, it's 17, now it's 2, she can't be coming and doing, I said listen, that 17 was just a conjecture on my part. I said, he just happened to say. I said, she didn't ask me. When I met her she told me that she needs $2,000 a month the 15th of the month....

Government Exhibit 401 at 2–5. Such knowing participation in the payment of hush money to Covone demonstrates Marino's willingness and desire to obstruct the grand jury's investigation of the crew's activities. While crew employees may have also had other reasons for refusing to testify before the grand jury, the payment of hush money to those who would not testify took away some of the coercive effect of being jailed for contempt. Such intentional obstruction of the grand jury's investigation clearly warrants the obstruction of justice enhancement that the government recommends.

### 3. Police Protection for Patrick Gervais

■ The government also contends that an obstruction of justice enhancement is also warranted because Marino participated in a scheme to provide police protection to Patrick Gervais' prostitution business. This court agrees. As explained in the background section of this opinion, Gervais paid $3,000 per month in street tax to cover the crew's interest and payoffs to individuals at the Lake County Sheriff's Department. Gervais testified at trial about the following conversation with DeLaurentis:

> Q. In this conversation what was said?
>
> A. Solly D said he heard that I was a good guy, that I understood things and the way they were and that it would cost me $3,000 a month to operate Cheri's Studios because that place was theirs.
>
> Q. Did he say what the $3,000 a month would be for?
>
> A. I did ask him that. He said it would take care of all my problems. It would take care of the heat and it would take care of us, him and the arm.
>
> Q. What did you understand "the heat" to mean?

A. The Lake County Sheriff's Department.

Q. And "the arm," who's that?

A. The organized crime.

Q. What did you say in response to this?

A. I told him that I had a partner who was supposed to take care of those things for me and I would have to get together with him before I pay anybody anything.

Q. Did you describe in any way your partner to Mr. DeLaurentis?

A. Yes, I did. I said his name was Vic. He had a brother Tony that lived out in Vegas and a brother Mike that owned a restaurant on North and Harlem Avenue.

Q. When you described your partner to Mr. DeLaurentis what, if anything, did he say in response?

A. He said, "Yes, Vic and I know each other. Vic understands things. There won't be any problem."

Q. Did Mr. DeLaurentis bring up anybody else's name during this conversation?

A. Yes, he did. He said he would get his partner Louie who was out of town to meet with Vic and discuss things with him.

Q. Was there any discussion of when the first $3,000 payment would be made?

A. Yes, he told me I would have to pay it by Friday night at 9:00 o'clock at the Journey's End to Louie, Louie Marino.

(Tr. at 8291–92, January 29, 1991). Gervais also testified about a similar conversation he had with Marino:

Q. When Mr. Spilotro waved you over to the table that had yourself and Mr. Marino, what did you do?

A. I went and sat at the table.

Q. Was there a conversation amongst the three of you?

A. Yes.

Q. What was said in that conversation?

A. Victor started the conversation. He said, "Pat," he says, "that joint up there is theirs. It's their territory. If you want to open up up there, you will have to deal with their man." He says, "Actually—" he told me, "Frankly, there is just not enough business in the place to consider it worth its while," and that he was going to back out of the business and allow me to operate it and I would have to deal with Louie to do that.

Q. When Mr. Spilotro said that's their territory up there, what, if anything, did Mr. Marino say?

A. He said, "Yes, that's right. That's ours."

Q. Did you have a discussion then with Mr. Marino?

A. Yes, I did. I asked him if he took care of the heat and took care of all my other problems that would exist up there. He said $3,000 would do that.

(Tr. 8307–08, January 29, 1991). Gervais also testified that Marino and DeLaurentis told him that he would receive advance warning of any raids or investigations of his house of prostitution:

Q. Was there any discussion about police in this conversation?

A. Yes, there was.

Q. What was said in that regard?

A. I asked how they will handle the arrest if the place was ever—what do you call it?

Q. Raided?

A. Raided, yes. And he said—

Q. Who said?

A. Louie. I am sorry. And Louie said, "We have a way of handling that. There will be a phone call on that day from the heat, and they will tell you that, 'My uncle is coming in tonight,' and from that point on you do everything legit. You don't do any blow jobs or anything else in the back room that was illegal."

(Tr. at 8309–10, January 29, 1991). Gervais further testified that he received such a warning on one occasion under the code previously given to him by Marino. This testimony is corroborated by the following March 9, 1982 conversation between him and DeLaurentis:

DeLaurentis: They got your phone number now. If anything comes down, (inaudible) calls and say "Your uncle's on the way."

Gervais: Yeah.

DeLaurentis: When they say that, just clean it up a little bit. Like if they see a stranger coming in, don't let them even work on him. Uh, give him a fucking message, no blow jobs or nothing.

Gervais: Alright we'll do photographs.

DeLaurentis: Or whatever it is ...

Gervais: You know.

DeLaurentis: ... that you do. And, uh, I mean you know your regular customers and you know who's a stranger.

\* \* \* \* \* \*

Gervais: Oh Solly, just out of curiosity, okay, I wanna make sure that this is, ah ... Okay, a week ago Monday, somebody gave us a call, right ... Okay, I just wanted to make sure.

DeLaurentis: Oh, no, I don't know ... you're telling me this (garbled).

Gervais: Okay, because one of my girls, uh, answered the phone, she hung it up, and she told the desk man who was in the bathroom at the time that, ah, a guy just called and says it's you uncle and we'll be comin' in tonight. Now this was, this is Mon ...

DeLaurentis: See, they don't call me. They call you straight.

Gervais: Right, okay.

Government Exhibit 315 at 9.

Marino's and DeLaurentis' bribery of police officers to protect Gervais' illegal prostitution operation clearly falls within the confines of Section 3C1.1. As the government suggests, "Marino's and DeLaurentis' attempts to give Gervais advance warnings of police raids was obviously to impede and obstruct the administration of justice in connection with the investigation and prosecution of the illegal activity." [24] Therefore, Marino's participation in obtaining police protection for Gervais provides another basis for the assessment of a Section 3C1.1 enhancement.

---

**24.** Government's Submission Concerning the Presentence Investigation Report for Louis Marino at 7.

**25.** Section 3B1.1(b) provides:
Based on the defendant's role in the offense, increase the offense level as follows:

### B. *Section 3B1.1(b): Crew Supervisor or Manager*

██ Marino objects to the probation officer's assessment of a 3 point enhancement pursuant to Section 3B1.1(b) because he claims that there is insufficient evidence to prove that he was a crew manager or supervisor.[25] However, this court is persuaded that Marino was a supervisor or manager and should receive this enhancement. For example, Marino held a supervisory position in the parlay card operation. In 1980, Sam Malatia was hired by DeLaurentis to distribute parlay cards. On occasion, Malatia would pick up his parlay cards from Marino at Marino's home and would receive money from Marino to pay off parlay card winners. In addition, voluminous parlay card stubs with parlay card agents' notations on them were found in Marino's home during a search by federal agents on November 13, 1983. The master parlay card stubs found also had the winners and losers noted on the stubs and were in sequence with the identical master parlay card stubs found by federal agents on the same date in Infelise's home.

Evidence was also presented which showed that Marino played a supervisory role at the Libertyville Casino. According to Jahoda and Charles Burge, Marino had responsibilities in the casino's cage, where chips were sold to players, and Marino was in charge of the casino's security. Marino supervised other aspects of the crew's gambling operation. For example, Marino supervised bookmaker Homer Gonzalez. Marino also supervised Nicholas' operation of floating black jack games and provided a juice loan bankroll to Nicholas so that Nicholas could give juice loans to his customers.

In 1989, when Infelise became crew boss, Marino was promoted to one of Infelise's top assistants. As explained in the background section of this opinion, because of his high

---

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

ranking position, Marino was considered one the persons capable of keeping the crew going in the event other high ranking crew members went to jail. *See* Government Exhibit 447 at 14–15.

Such extensive evidence clearly demonstrates that Marino served as a crew supervisor. In addition to assisting Infelise when Infelise became the crew boss, Marino supervised aspects of the crew's casino, bookmaker Homer Gonzalez, Nicholas' black jack games, and the crew's parlay card operation. Based upon this evidence, this court overrules Marino's objection to the assessment of a 3 point enhancement pursuant to Section 3B1.1(b).[26]

### C. *Section 5K2.0: Upward Departures*

The government argues that an offense level of 29 does not adequately reflect the seriousness of Marino's offenses and his involvement in the Ferriola Street Crew. Therefore, the government seeks various upward departures pursuant to Section 5K2.0. Section 5K2.0 provides:

> Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. Nonetheless, this subpart seeks to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines ... the court may depart from the guidelines, even

though the reason for departure is taken into consideration in the guidelines ... if the court determines that, in light of unusual circumstances, the guideline level attached for that factor is inadequate.

### 1. Hal Smith's Murder

■ One circumstance which the Commission envisioned might warrant an upward departure is established in Section 5K2.1. This section provides that if death results from the commission of the charged offense, the sentencing court may increase the sentence above the authorized guideline range. Section 5K2.1 also explains:

> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which the base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

U.S.S.G. § 5K2.1. The government contends that an upward departure from level 29 to 43 is appropriate in this instance so that Marino's sentence adequately reflects his involvement in Hal Smith's murder.[27]

---

**26.** Marino does not contest that there were at least five participants or the enterprise was otherwise extensive as required to assign a Section 3B1.1(b) enhancement. Twenty defendants were charged in the instant indictment and evidence was presented regarding the participation of other individuals in the Ferriola Street Crew's activities. Therefore, there is no question that there were more than five participants in this enterprise and that the enterprise was extensive.

**27.** According to the guideline's sentencing table, a total adjusted offense level of 43 requires a sentence of life in prison.

It is well established in this jurisdiction that relevant conduct can be considered for sentencing purposes. Application Note 1 to Section 2E1.1 provides that "where there is more than one underlying [RICO] offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)." Application Note 1(*l*) to Section 1B1.1 defines the term "offense" as "the offense of conviction and *all relevant conduct* under § 1B1.3 (Relevant Conduct) ..." (emphasis added). And, Section 1B1.3, in pertinent part, provides that relevant conduct includes "all acts an omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense ... or that otherwise were in furtherance of that offense."

The Seventh Circuit has established that a court must increase a defendant's base offense level to account for "relevant conduct" which was part of the same course of conduct or common scheme as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts. *Duarte,* 950 F.2d at 1263; *United States v. Franklin,* 902 F.2d 501, 504 (7th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). To increase a defendant's base offense level for uncharged or unconvicted activities, the court must find by a preponderance of the evidence that those activities were "part of the same course of conduct or common scheme or plan" as the convicted offense. *Duarte,* 950 F.2d at 1263.[28] A court making this determination "should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *Id.; see also United States v. Jewel,* 947 F.2d 224 (7th Cir.1991); *United States v. Edwards,* 945 F.2d 1387 (7th Cir.1991); *United States v. Morrison,* 946 F.2d 484 (7th Cir.1991).

This court has already determined that sufficient evidence has been presented to hold Marino accountable for Smith's death. Moreover, this court is persuaded by the evidence presented that Smith's murder was part of the RICO conspiracy charged in Count 1 of the superseding indictment of which Marino was found guilty. The government has shown that Smith resisted the crew's efforts to impose a street tax on his independent bookmaking operation. At one meeting in February or early March 1984, Smith offered to pay the crew half of what DeLaurentis demanded. When DeLaurentis refused this offer, Smith said, "Now you get nothing." A very loud and public argument ensued during which DeLaurentis told Smith that he was going to be "trunk music." It was after this meeting that Infelise, Bellavia, and Marino began stalking Smith and it was approximately one year later that Smith was murdered.

Such evidence adequately demonstrates that it was Smith's refusal to pay the demanded street tax which motivated crew members to murder him. Not only would the crew lose money on Smith, but it risked having other bookmakers refuse to pay street tax if word got out that Smith was not required to pay it. Murdering Smith sent a very clear message to independent bookmakers and other individuals in the crew's territory that the crew would not take "no" for an answer. The payment of street tax and control over gambling and related activities in the crew's territory was an integral part of the RICO conspiracy charged in Count 1. Therefore, since the government has proven by a preponderance of the evidence that Marino was part of the conspiracy to murder Hal Smith and Smith's murder was part of the plan of the RICO conspiracy of which Marino was found guilty, this court finds that Smith's murder can be considered for sentencing purposes.

This court also finds that an upward departure pursuant to Section 5K2.1 is warranted because the guidelines applicable to Marino's participation in the charged RICO

---

**28.** Marino acknowledges that the standard of proof governing upward departures is the preponderance of the evidence standard. *See* De-

fendant Marino's Answer to the Government's Motion for Upward Departure at 4.

conspiracy do not adequately account for his involvement in Smith's murder. This court does not find, nor has Marino demonstrated, that the guidelines applicable to Marino's offenses account for the death of a victim of the charged RICO conspiracy. Section 5K2.0 permits a sentencing court to upwardly depart in cases, such as this one, where aggravating circumstances exist which are not adequately accounted for by the applicable guidelines. Section 5K2.1 further supports this court's determination by identifying the death of a victim of the offense as an aggravating circumstance which may warrant an upward departure.

■ Having determined that an upward departure pursuant to Section 5K2.1 is appropriate, the remaining question is how high a departure is warranted. Upon careful review of the evidence, this court finds that a departure up to level 43 is appropriate because the circumstances surrounding Smith's death demonstrate that this offense is comparable to first degree murder. Smith refused to pay street tax to the crew during 1983–1984 and had a loud argument about it with DeLaurentis in late February or early March 1984. According to Jahoda's trial testimony, it was after this meeting, in the spring of 1984, that Infelise, Bellavia, and Marino began stalking Smith. They had Jahoda set up meetings with Smith so that they could observe him. Then, on February 7, 1985, Jahoda brought Smith to his house, where Infelise, Bellavia, and Marino were waiting for Smith, pursuant to Infelise's February 5, 1985 order. As ordered, Jahoda and Smith drove Smith's car to Jahoda's house, Jahoda sent Smith into the house through the kitchen, and Jahoda never entered the house.

This testimony amply indicates that crew members carefully planned Smith's murder before he was brought to Jahoda's house on February 7, 1985. Infelise, Bellavia, and Marino spent several months stalking Smith before they set up the murder plan with Jahoda at a February 5, 1985 meeting. Since the evidence sufficiently demonstrates that Smith's murder was premeditated and that more than minimal planning was required, this court finds that it is appropriate to upwardly depart to a level comparable to the offense level for first degree murder—level 43. Therefore, Marino should be assigned an upward departure pursuant to Section 5K2.1 so that his total adjusted offense level is 43.[29]

An upward departure to a level 43 has recently been approved by the Seventh Circuit in a case, like this one, where the defendant was not found guilty of murder, but the government proved by a preponderance of the evidence that the defendant was responsible for the victim's death. In *Masters*, the Seventh Circuit upheld Judge Zagel's determination that the defendant, who had been found guilty of conspiracy to murder his wife as part of a RICO conspiracy but not guilty of murder, should receive an offense level of 43 to account for his participation in his wife's murder. 978 F.2d 281. One of the three ways Judge Zagel calculated the defendant's offense score so as to reach a level 43 was to upwardly depart pursuant to Section 5K2.0 as this court is doing here. *Id.*, at 283–84. The Seventh Circuit was not persuaded by the defendant's claim that such a departure was inappropriate because he was neither charged nor convicted of murder. As the Seventh Circuit explained:

> The guidelines start with the offense of conviction. (Citations omitted). But real-

---

**29.** The government also argues that their motion for an upward departure is supported by Section 5K2.8. This section provides:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. § 5K2.8. While a departure beyond that which has already been assigned is not pos-

sible, this court notes that this section further supports the government's request for upward departure. The medical examiner testified at trial that Smith had at least 45 non-fatal wounds and injuries in the face, neck, and head areas. These wounds included contusions, bruises, stab wounds, and lacerations, and Smith's neck was slit. This testimony supports the government's assertion that Smith was tortured and such brutal and cruel conduct suggests an additional basis for the upward departure assigned to Marino.

offense principles influence not only the aggravating and mitigating factors but also the definition of relevant conduct under § 1B1.3.

*Id.*, at 284. The Seventh Circuit determined that the only way for the defendant to overcome Judge Zagel's sentencing calculations would be to upset the Judge's finding that he was responsible for his wife's murder. *Id.*, at 285. Since the Seventh Circuit agreed with Judge Zagel that the defendant's responsibility for his wife's murder had been proven by a preponderance of the evidence, the appellate court affirmed the sentence Judge Zagel imposed. *Id.*, at 287.

Judge Zagel's second method for calculating the defendant's offense level in *Masters* provides additional support for this court's determination that a departure up to level 43 is appropriate. As Judge Zagel explained, Section 2E1.1(a)(2) refers to "the offense level applicable to the underlying racketeering activity." *Id.*, at 284. Under this provision, the appropriate offense level to turn to is the guideline section for murder, Section 2A1.1, whose offense level is 43. *Id.* The Seventh Circuit found this comparison to be appropriate. *Id.*

### 2. Participation in Organized Crime

 The government also contends that Marino should receive an upward departure for participation in organized crime.[30] As stated above, Section 5K2.0 establishes that an upward departure is permissible if the sentencing court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." U.S.S.G. § 5K2.0. The government argues that participation in organized crime is not adequately accounted for under the RICO sentencing guidelines. Therefore, the government contends that given Marino's extensive involvement in organized crime, such an upward departure is warranted in this case.

RICO is intended to be a broad statute which can be applied to legitimate and illegitimate enterprises. *See United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981); *United States v. Lee Stoller Enterprises*, 652 F.2d 1313, 1316–18 (7th Cir.1981); *United States v. Aleman*, 609 F.2d 298, 302–03 (7th Cir. 1979). However, contrary to the government's contention, the fact that RICO can be applied to both legitimate and illegitimate enterprises does not necessarily mean that RICO does not adequately account for a defendant's participation in organized crime. Indeed, when applied to illegitimate enterprises, this is exactly what RICO is intended to do. *See Aleman*, 609 F.2d at 303. The fact that RICO is part of the Organized Crime Control Act, whose stated purpose is to eradicate organized crime, lends strong support to this determination. *See* The Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 923 (1970) (Statement of Purpose and Intent).[31]

The government notes that this court has found and the Seventh Circuit has approved the assessment of an upward departure for use of a defendant's organized crime connections to further his criminal activities. *See United States v. Schweihs*, 733 F.Supp. 1174 (N.D.Ill.1990), *aff'd in part and rev'd in part,*

---

**30.** While a departure above level 43 is not available under the guidelines, this court will still evaluate the government's request to ensure that there is a complete record of all potentially appealable issues with respect to Marino's sentence.

**31.** The government also argues that the computation method for Section 2E1.1 demonstrates that a defendant's membership in organized crime is not accounted for under RICO. Section 2E1.1 requires that the base offense level for a RICO violation be the greater between 19 and the offense level applicable to the underlying racketeering activity. The computation of the offense levels for each underlying activity is made by assessing each offense and its adjustments as if each underlying activity was a separate offense. *See* Section 2E1.1, Application Note 1. According to the government, the total offense level for a RICO violation is established by reference to the underlying racketeering acts committed by a defendant, without even considering the defendant's membership in organized crime. However, as this court has noted, RICO was established, in significant part, to assist in the eradication of organized crime. This court is not persuaded that the method for calculating RICO offense levels overcomes this fact and warrants assessing defendants an upward departure for their participation in organized crime.

971 F.2d 1302 (7th Cir.1992). However, this court's determination in *Schweihs* that such an upward departure was appropriate does not necessarily mean that such a determination is appropriate in this instance. Unlike Marino, the *Schweihs* defendant was not convicted of a RICO violation. Rather, he was convicted of conspiracy to commit extortion, attempted extortion, and solicitation to commit a crime of violence. It was the fact that these offenses did not account for one's involvement with organized crime, like a RICO violation, that persuaded this court to assess an upward departure in that case. *See Schweihs*, 733 F.Supp. at 1179. Here, RICO adequately accounts for defendants' membership in organized crime.[32] Therefore, the government's motion for an upward departure for participation in organized crime is not warranted.[33]

### 3. Defendant's Ex Post Facto Objection to Upward Departures

■ Marino argues that upward departures pursuant to Sections 5K2.1, 2A1.5, and 3D1.4 are not appropriate because they violate his rights under the ex post facto clause of the Constitution. Smith was murdered in 1985 and the indictment in this case was returned in February 1990, but Section 5K2.1 did not become effective until November 1987, Section 2A1.5 did not become effective until November 1990, and Section 3D1.4 did not become effective until November 1991.

Marino argues that he should not receive a substantial increase in his punishment based upon subsequent amendments to the guidelines.

While the appellate court did not directly rule on this issue, the Seventh Circuit upheld the propriety of relying on Section 2A1.5 in a case, like this one, where the offenses were committed before the guidelines were amended, but the sentencing took place after the amendments. *Masters*, 978 F.2d at 284. In response to the *Masters* defendant's ex post facto claim, the Seventh Circuit recognized that Congress requires courts to apply the guidelines "that are in effect on the date the defendant is sentenced." *Id.* (citing 18 U.S.C. § 3553(a)(4). The Seventh Circuit also cited *United States v. Bader*, 956 F.2d 708 (7th Cir.1992), a case which was critical of applying ex post facto analyses to the guidelines. Moreover, the Seventh Circuit determined that ex post facto issues really were not at issue because the sentencing court had determined that the amendment which established Section 2A1.5 clarified, rather than changed, the law. *Id.*

The Seventh Circuit's response to the *Masters* defendant's ex post facto argument is instructive in this instance. Not only does the appellate court's determination establish that Section 2A1.5 can be applied retroactively, but it indicates that Sections 5K2.1 and 3D1.4 can also be applied retroactively. As the appellate court noted in *Masters*, Section

---

**32.** Marino argues that the government has not adequately demonstrated that he was involved in organized crime. This court disagrees. Marino was convicted of racketeering offenses which included the collection of unlawful debts and running illegal gambling operations. The evidence presented at trial, particularly regarding the collection of unlawful debts, amply demonstrates that Marino used his connections with organized crime to further the commission of his offenses.

**33.** The government further argues that if this court does not accept in whole or in part the government's guideline calculations and/or recommended departure for Smith's murder, an upward departure would be warranted pursuant to Section 3D1.4 (Determining the Combined Offense Level). The background notes to Section 3D1.4, in pertinent part provide:

> In unusual circumstances the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups

and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts.... Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines....

The Guidelines establish that such an upward departure may be warranted where the number of underlying offenses is so large that it results in significantly more than the five units employed under Section 3D1.4. *See* Section 3D1.4, Background Notes. As the government suggests, Marino's offenses result in 10½ units, twice the number of units available under Section 3D1.4. Therefore, this court finds that given that Marino's offenses total significantly more than 5 units, Section 3D1.4 provides an additional basis for an upward departure.

3553(a)(4) requires sentencing courts to apply the guidelines "that are in effect on the date the defendant is sentenced." 978 F.2d at 284. Moreover, the Seventh Circuit has been critical of applying ex post facto analyses to the guidelines. *See Bader*, 956 F.2d at 709.[34] Since Sections 2A1.5, 5K2.1. and 3D1.4 will be in effect at the time of sentencing, this court finds that their application to Marino's sentence does not violate his rights under the ex post facto clause.[35]

**4. Summary**

■ In sum, this court finds that Marino's total adjusted offense level is 43. However, since none of the counts of which Marino was convicted bears a maximum penalty of life imprisonment, this court finds that the best way to effectuate the sentence described above is to impose consecutive sentences on all counts of which he was found guilty. This determination comports with Section 5G1.2(d), which provides:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, to the extent otherwise required by law.

This calculation method has also been permitted by this Seventh Circuit. *See Masters*, 978 F.2d at 1369.

**D. Objections to Statements in the PSI**

**1. Section 3E1.1: Acceptance of Responsibility**

■ Marino also raises numerous objections regarding computations for other offenses of which he has been found guilty.[36] Marino objects to the following statement in his PSI:

> The defendant has chosen not to discuss or provide a written statement regarding his participation in the instant offense due to an appeal. In the light of this it does not appear the defendant has accepted responsibility for his criminal conduct.

PSI at 27, lines 1031–35. Marino argues that his actions since his arrest in February 1990 demonstrate that he has accepted responsibility for his actions. According to defendant, he has been in custody since charged, he attended trial, and he has been in contact with Assistant United States Attorneys, FBI and IRS agents, and Illinois police officers. Marino has been advised by his attorneys not to submit a statement of this case due to the expected appeal of this case. Marino claims that it is not appropriate to penalize him for protecting his rights on appeal.

Section 3E1.1 provides for a two point reduction where a defendant clearly demonstrates acceptance of responsibility for his

---

34. As the Seventh Circuit explained in *Bader:*
 Although the guidelines influence the exercise of discretion within the statutory range, judges may depart at appropriate times. On this understanding, a change in the sentencing guidelines is no different from, say, the institution of a get-tough policy under which the prosecutor no longer accepts pleas to lesser offenses, or the appointment of a new judge who favors longer sentences, or a change in the guidelines for parole (citation omitted), or a decision by the President to cease commuting the sentences of a class of felons. All of these may increase the time a criminal spends in prison without transgressing the ban on ex post facto laws.
 956 F.2d at 709.

35. In addition, the application of Section 5K2.1 does not violate Marino's rights under the ex post facto clause because the RICO conspiracy of which Marino was convicted continued through the return of the superseding indictment in this case in 1990. Despite the fact that Smith was murdered in 1985, the continuation of the RICO conspiracy beyond the dates when the guidelines and Section 5K2.1 were promulgated suggests that these guideline provisions were not improperly applied retroactively. The upward departure assessed against Marino applies to the RICO conspiracy of which he was convicted that continued through August 1990. Therefore, Marino's rights under the ex post facto clause of the constitution are not violated by the application of Section 5K2.1. *See United States v. Mettler*, 938 F.2d 764, 768 (7th Cir.1991).

36. While these remaining objections have no bearing on Marino's sentence because these offenses are overshadowed by Marino's offense level for Count 1, for purposes of a clear record, this court will review Marino's and the government's remaining objections to the PSI.

offenses. It is clear to this court that Marino is not entitled to such a reduction because he has not demonstrated a recognition or affirmative acceptance of responsibility for his criminal conduct. Marino has not acknowledged his responsibility nor shown remorse for the offenses of which he was convicted. Contrary to his contention, Marino is not being punished for choosing not to submit a written version of the offense. Rather, defendant is not being rewarded with a reduction pursuant to Section 3E1.1 because his actions do not demonstrate that he is entitled to such a reduction. Attending trial and being in custody are not the type of affirmative steps which warrant a reduction under Section 3E1.1.[37] Marino's decision not to submit a written statement of the offense has no bearing on this determination.

Marino claims that he is not attempting to obtain a reduction pursuant to Section 3E1.1, but he is only trying to demonstrate that he has been a respectful and well behaved defendant. However, this has no bearing on the appropriateness of the probation officer's statement and the determination of whether Marino has accepted responsibility for his criminal conduct. As stated above, Marino is not being punished for choosing not to submit a written version of the offense. And, this court is not persuaded that the disputed statement in Marino's PSI is inaccurate or inappropriate. Therefore, Marino's objection to the above noted statement in the PSI is overruled.

**2. Factual Inaccuracies in the PSI**

■ Marino also argues that there are factual inaccuracies in the PSI which should be corrected. For example, the PSI states: "According to the superseding indictment, the criminal activity began from in or about late 1974 up to and including the date of the indictment, August 29, 1990." PSI at 1, lines 29–31. Marino contends that he was arrested on February 7, 1990 and has either been in custody or out on bail, with the condition

of house arrest, since that time. Since he was removed from the conspiracy by his arrest in February 1990, Marino claims that the above noted statement should be stricken because it incorrectly suggests that he participated in the conspiracy for approximately 6 months after his arrest.

Contrary to Marino's contention, the disputed statement is not inaccurate. The conspiracy and the related criminal activity charged in Count 1 continued through the return of the superseding indictment in August 1990. Marino's alleged inability to actively participate in the conspiracy after his arrest in February 1990 does not change this fact. A defendant's arrest or incarceration does not necessarily mean that the conspiracy with which he was involved nor his participation in that conspiracy did not continue. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Therefore, this objection to the PSI is overruled.

■ Marino also argues that the following statement in the PSI is not accurate:

The United States Probation Offices assigned to this investigation met with the investigating case agents on this case, to include Special Agents John Mallul of the Federal Bureau of Investigation, Lynette Redmer, Tom Moriarty and Mark Lischka of the Internal Revenue Service. The agents indicated that all of the defendants in this case knew or were fully aware of what they were getting into and what they were getting involved with. All defendants were aware of Jahoda's cooperation. All defendants were given ample opportunity to cooperate with the government prior to their indictments. Despite this, everyone refused.

PSI at 2–3, lines 84–94. Marino claims that the agents in question were not qualified to say "that all of the defendants in this case knew or were fully aware of what they were

---

**37.** Application Note 1 to Section 3E1.1 identifies factors which may be considered when determining whether a defendant has accepted responsibility for his criminal conduct. Factors include, but are not limited to: truthfully admitting the conduct comprising the offense of conviction, voluntarily withdrawing from criminal conduct, voluntarily making restitution, voluntarily surrendering to authorities, and voluntarily assisting authorities in the recovery of the fruits and instrumentalities of the offense. U.S.S.G. § 3E1.1, Application Note 1.

getting into ..." [38], and the agents' statements were not accurate. However, as the government suggests, Marino fails to explain how the above noted statement is inaccurate. The evidence presented at trial, including victims' testimony and tape recordings of defendants' conversations, clearly demonstrates the nature of the conspiracy and other charges against defendants, and defendants' knowing participation in them. Therefore, Marino's objection to the inclusion of this statement in his PSI is overruled.

 Marino also claims that the following portion of the PSI contains inaccuracies:

In terms of culpability, the case agents ranked all of the defendants on a six tier hierarchy. The first level was Joseph Ferriola, (who is deceased); on the second level is Rocco Infelise, (boss); on the third level is Salvatore DeLaurentis, (top assistant); Robert Bellavia, (supervisor); and Louis Marino, (juice loan, parley cards supervisor). The fourth level is William Jahoda (day-to-day manager). The fifth level consists of William D. DiDomenico, (agent, wire room supervisor and later promoted to DeLaurentis' right-hand man). Jahoda was demoted and DiDomenico took Jahoda's place. Also on the fifth level is Michael Zitello, (agent, and wire room supervisor); Robert Salerno, (collector of street tax, juice loans); Michael Sarno, (collector of street tax, juice loans, parley cards). On the sixth and last level is Robert Garrison, (50/50 bookmaker and wire room clerk); James Coniglio, (agent, who settled up with bettors and also collected street tax); Paul Spano, (juice loans, owns/trucking company); Ronald DeRosa, (agent and wire room clerk); James Nicholas, (50/50 bookmaker and casino games); Thomas McCandless, (clerk and 50/50 bookmaker); Frank Maltese, (agent, also fixed court cases); and the defendant Robert Covone, (agent).

PSI at 3, lines 95–115. Marino contends that Jahoda was a key figure in the crimes he claims were committed by Marino. Therefore, Marino questions why he has been placed in the third level and Jahoda in the fourth level of the six tier hierarchy of culpability.

The evidence adduced at trial clearly demonstrates that while Marino began in a subordinate position to Jahoda, Marino advanced until he became one of the three overall supervisors of the Ferriola Street Crew's activities. The following conversation between Bellavia and Jahoda on October 30, 1989 supports this determination:

Jahoda: So I skipped the link of command. I really didn't have time. I didn't get the information. I met the guy at 9 in the morning.

Bellavia: You know what happened? It got to the point now where he's [Infelise] so busy, and there's guys like me, Louie and Solly ...

Jahoda: Well, yeah, I appreciate that.

Bellavia: It went into that. Just so you know. (Inaudible).

Jahoda: I do. I do.

Bellavia: And he's up here now, and it's a little hard, not that you're not that important. It's there's just so many other fucking things going on. You can't handle everything.

Jahoda: I don't even want to bother the man. But I also don't want anybody to look at me as any kind of problem.

Bellavia: Yeah, no, I don't think it ever comes into thought.

Jahoda: Because I know when I compliment you and Louie on the promotions, as well as Solly, ...

Bellavia: Yeah.

Jahoda: ... I think it's terrific.

Government Exhibit 457 at 11–12. Other recorded evidence further indicates that Marino held a supervisory position in the crew. For example, in the following October 18, 1989 recorded conversation, DeLaurentis indicated that he could not interfere with Nicholas' wagering activities because Marino supervised him and Marino could not interfere with Jahoda's activities because DeLaurentis supervised him:

Jahoda: Plus this other, and I can't think of another word, I don't know, rivalry's the

---

**38.** Comments of Louis Marino on the Presentence Report, and Request for Hearing at 4, ¶ B3.

wrong word, but just, Jimmy [Nicholas] wants a bigger piece of the pie.

DeLaurentis: Well, Jimmy's got hot nuts, you know. He's got a . . .

Jahoda: Yeah, but he's doing dead wrong.

DeLaurentis: Between you and me now.

Jahoda: I know he does. But he's so dead wrong. he's so out of line. But I can't talk to him.

DeLaurentis: He thinks he's going to set the world on fire now that he got an OK, you know what I'm saying? It'll come done. It'll come down in the long run.

Jahoda: Well, one thing that would look dumb down the road, is that we got the same dealers at the same game, but there ain't nobody else that I know of, so I mean, I don't mind, I don't mind that at all.

DeLaurentis: See, I can't interfere with that too much, because he's Louie's, you know what I mean?

Jahoda: I know. I know.

DeLaurentis: Like Louie can't fuck with you. You know it's the same thing.

Government Exhibit 444 at 26–27. DeLaurentis again referred to Marino's supervisory position with respect to maintaining a juice loan bankroll in the following October 18, 1986 conversation with Nicholas Koritsaris:

DeLaurentis: He, ah, you know his cousin, the bull dog, Mike [Pascucci]?

Koritsaris: The guy you used to come with, an older guy?

DeLaurentis: No. No. No. Look likes he could bite a hole through the wall. Looks like a fucking tank.

Koritsaris: Yeah.

DeLaurentis: He said he gave it [juice money] to him. To put out. And he, you know, he gets blues.

Koritsaris: Blue . . . (inaudible).

DeLaurentis: So, Joe says I got it from Mike. It's Mike? Who's the fuck told Mike to do anything in Lake County. he says well he's with Louie [Marino]. I said I don't give a fuck if he's Jesus Christ. You don't fuck and come here and give you money. I says and you're fucking lying because you told George to say to was for free, there was no interest. I mean Pete

and you told him not to let me know about it. So I says you tell that fucking cousin of yours to call me. So he called me and I says "listen you bulldog motherfucker." See he's a real tough guy.

Koritsaris: Yeah.

DeLaurentis: Yeah. You, you know can't let him get the first edge on you.

Koritsaris: Yeah.

DeLaurentis: I says "you bulldog mother fucker," I ever catch you in fuckin' Lake County again I'll knock your mother fuckin' head off. He says 'well what about my money?' I says it's in my pocket. You wanna come and get it? He says well it ain't my money, it's Louie's. You want me to tell Louie that. I say you tell anybody the fuck you want. Okay. So now he's figuring me and Louie will get in a beef, right. So, ah, he calls B.J. [Jahoda] for help. So B.J. says, fuck I can't help you with Solly. What the fuck can I do with Solly. He say well I got to talk to somebody, so he says I'll have somebody else call you. So Rocky called already he says Mikey, I'm going to tell you for the last time, when Solly says shit, you fucking squat 'cause if I turn him loose, he will knock you fucking head off.' He says one word from, the only reason he didn't knock your fucking head off already, he says turban. He says he wanted to put a fucking turban on your head. You know what that is don't ya?

Koritsaris: No.

DeLaurentis: You break a guy's head, they have to wrap it.

Koritsaris: (Laughs).

DeLaurentis: Fucking gauze. He says if it was up to Solly, you'd have been wearing a fucking turban already. He says now I am telling you, you fucking get out of line again, he's got the "Go" sign now. He says if you fart in that fucking county and you don't tell him about it first, he will put a fucking turban on your head. So he's shitting, nobody come for the fucking money.

Koritsaris: Is that right? Yeah, but did Louie, Louie know anything about it or he was just bullshitting?

DeLaurentis: No, Louie didn't know nothing about it.

Koritsaris: He was bullshitting?

DeLaurentis: Yeah. I mean Louie gives a, here like let's say I give you $5,000 to put out, I don't know who you are giving it to.

Koritsaris: Right. That's not . . .

DeLaurentis: Yeah. Louie don't give a fuck. He owes Louie the money now. But Louie and me are the same people. You know what I mean?

Government Exhibit 327 at 1–3.

In addition, on October 21, 1989, when DeLaurentis expressed his concern to Jahoda that crew leaders may soon be arrested, he proposed Marino as one of the people capable of keeping the crew's activities going while other leaders where in jail:

DeLaurentis: You know, I'm going to try and keep this thing going. Let's say they scoop us. I'm putting guys in now to keep this fucking thing going. One thing is going to jail and you still got everything going, and you know that, like you did last time.

Jahoda: Oh, yeah.

DeLaurentis: That's another thing to go we're all closed up, you know. So I'll try to get a couple of guys in line nobody's home, B. You know, either me or Rocky or Louie, one of us, it will be a lot better if one of us is out on the street.

Jahoda: True.

DeLaurentis: If we're all gone, then the guys behind us. We might lose a little money, somebody might steal a little along the way, but we still got it going.

Government Exhibit 447 at 14–15.

In light of the evidence regarding Marino's supervisory position over many of the crew's activities, this court finds that Marino should not be placed in a subordinate position to Jahoda as Marino suggests. As DeLaurentis indicated, Marino supervised Nicholas just as DeLaurentis supervised Jahoda. Since such evidence adequately demonstrates that Marino held a higher position in the Ferriola Street Crew than Jahoda, Marino's objection to this suggestion in the PSI is overruled.

▆▆▆ Marino contends that there are also several inaccuracies in the following statement in the PSI:

A group interview was held between the United States probation officers assigned to this investigation and Assistant United States Attorney Mitchell A. Mars, David D. Buvinger, and Mark S. Prosperi. The Assistant United States Attorneys basically agreed with the case agents ranking of the defendants in terms of culpability, with a few exceptions. Two more tiers were added to make the hierarchy an eight-level hierarchy. On the sixth level, there is Spano who used his business as a front. Maltese, who is a public official and had political ties; and Nicholas who is reported as the son-in-law of Ferriola and who was involved in the street crew activities for a long period of time. On the seventh level is Coniglio and Covone. On the eighth and last level is Garrison, McCandless, and DeRosa who is viewed as the least culpable.

Although the defendant was a strong-arm collector for the crew, to the government's knowledge the defendant did not or was not in possession of any weapons other than on one occasion in a restaurant when the defendant put a knife in Hospodar's ribs. On another occasion, the defendant shook someone who he had hanging upside down. Other than that, the government indicated they have no knowledge of any serious bodily injury inflicted by the defendant, with the exception of the defendant's participation in the Hal Smith murder. The government is of the opinion that the defendant participated in the Hal Smith murder, based upon preponderance of the evidence, to include Jahoda's witnessing and tape recordings implicating the defendant. Assistant United States Attorney Mitchell A. Mars indicated for the calendar year 1983, the defendant reported a combined income in the amount of $36,762. However, the defendant made in excess of this amount, whereas, he did not report an additional $20,000. Mr. Mitchell Mars indicated that the defendant's participation in the instant offense lasted from early 1979 to the date of the indictment.

PSI at 3–4, lines 122–158. Marino argues that this statement does not make it clear that the knife involved in the Hospodar incident was a utensil from the restaurant where they had a meeting and that, according to Hospodar's testimony, Marino did not put a knife to Hospodar's ribs to hurt or coerce him.

The government agrees that the knife used in the Hospodar incident was a utensil from the restaurant where they were meeting, but fails to see how this fact exculpates Marino. This court agrees. As explained in the background section of this opinion, Hospodar was responsible to the crew for $12,000 in unpaid debts by his bettors. On February 6, 1981, Hospodar taped a conversation he had with Marino and DeLaurentis at a restaurant about the money he owed. In pertinent part, the following discussion took place:

> Marino: (Inaudible) . . . He got any money today?
> DeLaurentis: He ain't got nothin', nothin'.
> Marino: Nothin' . . . You motherfucker, I wish this was real, you motherfucker, I'll give ya' it right here ya' dirty mother, come on [at this point in the conversation, Marino picked a knife up off the table and stuck it in Hospodar's ribs].

Government Exhibit 304 at 6–7. Pulling a knife on Hospodar while threatening him clearly evidences Marino's desire to intimidate and coerce Hospodar into paying off his debt. And, contrary to Marino's assertion, Hospodar testified that he felt threatened by Marino's actions and, after this conversation, he thought Marino and DeLaurentis would "mess me up" if he did not pay off his debt. (Tr. at 1997–1998, Nov. 7, 1991).

▇▇ Marino also contends that the record does not clearly indicate that Marino "shook someone who he had hanged upside down" as stated in the PSI. According to Marino, this was merely part of Jahoda's "colorful" testimony. The disputed description refers to the collection of money from Ray Cavanaugh. And, contrary to Marino's suggestion, this court finds that this description was not merely part of Jahoda's colorful testimony. Jahoda's testimony is corroborated by the following May 30, 1989 recorded conversation between Zitello and Jahoda:

Jahoda: What the hell name jumped out of the blue? Cavanaugh. Ray Cavanaugh? Have I got that name right? Or is that a guy of yours that was with the Board of Trade or something?

Zitello: Board of Trade guy, yeah.

Jahoda: Why did that name cross my mind? There's a guy I've never met. I remembered I talked to him one time on the phone.

Zitello: That was that fat fucker that ah, he was a friend, he knew, he was a friend of, ah of Burt's.

Jahoda: Burt Goldstein?

Zitello: Yeah.

Jahoda: Was this your account, though? Did you, did you pick him up through Burt when you were seeing Burt in those days?

Zitello: I must have, yeah. Cuz I remember, I was seeing him.

Jahoda: But is this the guy that Louie . . .

Zitello: Me and Louie went down there to grab him one day. I went right in, Louie didn't want to go in. I went right down on the floor and when they were in the pit that time. And I grabbed him at A–1 that time.

Jahoda: What happened down at the Board of Trade, though? I thought that ah . . .

Zitello: Me and Louie went down to see him.

Jahoda: The story I heard was that Louie grabbed him and was going to throw him off the balcony or something?

Zitello: He grabbed, I went down in the pit and got him. That was it.

Jahoda: You brought him out of the pit.

Zitello: Dragged him out of the pit.

Jahoda: What do you mean dragged him, physically?

Zitello: Well, I had to grab him and get him out of the pit. He's a big, fat fucker, too. Not fat fat, but he was pretty like bullish. Then Louie talked to him in the hallway, if I remember correctly.

\* \* \* \* \* \*

Jahoda: But what happened with this Cavanaugh? Did we ever get him back on the sheet?

Zitello: We never got him back. We went ah, I think he eventually squared everything up. It took about a year or something.

\* \* \* \* \* \*

Jahoda: And I don't know why, I just remember the story. I don't know whether it came from Burt or from you that Louie was going to throw this guy over the balcony. But I wasn't there. I never knew anything about it.

Zitello: Yeah, he grabbed him in the hallway.

Government Exhibit 402A at 1–3. Since there is sworn testimony and a recorded conversation which suggest that Marino shook Cavanaugh, this court finds that the description of this event in the PSI is appropriate. Therefore, Marino's objection to this description is overruled.

### E. Base Offense Levels for Racketeering Acts 6, 9(a), and 10(a)

▉ Marino next objects to the probation officer's determination of the base offense levels for Racketeering Acts 6, 9(a), and 10(a). According to Marino he was only convicted of intimidating Kenton Pielet, Ken Eto, and Patrick Gervais and not of extorting these men. Therefore, Marino argues that the proper guideline provision to apply is Section 2A6.1(a) (Threatening Communications), rather than Section 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) as the probation officer did in the PSI.

Section 1B1.2(a) provides that the proper guideline section to be applied is that which is most applicable to the offense of conviction.[39] A review of the evidence presented regarding Marino's attempts to obtain money from Pielet and Eto demonstrates that Sec-

tion 2B3.2, and not Section 2A6.1, is the most appropriate guideline to apply to these offenses. As described in the background section of this opinion, Pielet began making street tax payments to the crew after Marino scared him by slapping him across the face. As further described in the background section of this opinion, Eto testified that he sought the crew's permission to open a Bolita game because he knew that if he failed to get permission before opening the game, he could very well get hurt. The crew permitted Eto to run the Bolita game on the condition that he pay street tax. Eto met Marino and Infelise monthly to pay off the street tax. And, with respect to Gervais, Marino fails to note that he was also convicted of Racketeering Act 10(b) which charged him with attempting to extort or extorting Gervais. This evidence demonstrates that Marino's participation in the intimidation of Pielet, Eto, and Gervais involved the use or threat of force as required to apply Section 2B3.2. Indeed, such threatening actions were characteristic of Marino's collection tactics.[40] Therefore, contrary to Marino's suggestion, this court finds that this provision, and not Section 2A6.1, should be applied to these offenses.

### F. Base Offense Levels for Racketeering Acts 11(a)-(b)

▉ Marino argues that Section 2A6.1, rather than Section 2B3.2, should also be applied to Racketeering Acts 11(a)-(b). Racketeering Act 11(a) charged Marino with intimidating George Miller and Racketeering Act 11(b) charged Marino with attempting to extort or extorting George Miller. However, there is no distinction between attempted extortion and extortion under the guidelines. Section 2X1.1(a) provides that the base offense level for an attempt is the same as the base offense level for the underlying substantive offense. And, there is no decrease in

---

**39.** Application Note 2 to Section 2E1.1 provides that if the underlying offense constitutes a violation of state law, the offense level corresponding to the most analogous federal offense should be used.

**40.** For example, as previously explained, Marino stabbed Hospodar with a knife when collecting

money from him. Marino also shook bettor Ray Cavanaugh to the point that Zitello thought Marino would throw Cavanaugh over a balcony. Marino also physically braced one of George Miller's delinquent bettors up against a wall and then helped turn him upside down and take money from the bettor's wallet.

Marino's offense level pursuant to Section 2X1.1(b)(1) because Marino completed all the acts he believed necessary to successfully extort Miller. Therefore, as with Racketeering Acts 6, 9(a), and 10(a)-(b), this court finds that the appropriate guideline provision to apply to Racketeering Acts 11(a)-(b) is Section 2B3.2. Marino's objection to these guideline calculations is overruled.

### G. *Further Objections to Statements in the PSI*

■ Marino also argues that the statement in the PSI that defendant was "found guilty by a jury ... of three counts: racketeering conspiracy, illegal gambling conspiracy and submitting false and fraudulent tax returns," PSI at 26, lines 1000–1002, is not accurate. With respect to the tax count, Marino argues that the PSI should be amended to reflect that he was only convicted of submitting one false and fraudulent tax return rather than "false and fraudulent tax returns" as stated in the PSI. The government concedes that Marino was only charged and convicted of one count of filing a false and fraudulent tax return. Therefore, Marino's objection to this statement in the PSI is granted and this court orders the disputed sentence to be amended to reflect this fact.[41]

■ Marino also contends that the statement in the PSI that "the jury found that defendant agreed to ... the intimidation and extortions of Patrick Gervais and George Miller, Jr," PSI at 26–27, lines 1003–1007, is not accurate and should be amended. As Marino suggests, the jury's verdict with respect to Racketeering Acts 10(b) and 11(b) provide that he agreed to the "attempted extortion or extortion" of Gervais and Miller.[42] Therefore, Marino's objection to the above noted statement in the PSI is granted. This court orders the disputed sentence in the PSI to be amended to read as follows: "the jury found that defendant agreed to ... the intimidation and attempted extortions or

extortions of Patrick Gervais and George Miller, Jr."

■ Marino also objects to the following statement in the PSI:

The defendant has no prior convictions. Whether or not used as a front, it appears for the most part, the defendant has maintained legitimate employment during his participation in criminal activity.

PSI at 27, lines 1036–39. Marino argues that this statement is not accurate because it suggests that he may have used legitimate employment as a front for his criminal activity. This court finds that this statement may be prejudicial to defendant. This court modifies the second sentence of this statement as follows: "It appears for the most part, the defendant has maintained legitimate employment during his participation in criminal activity." Therefore, Marino's objection to this statement is granted.

### H. *Objections to the Government's Version of the Offense*

■ Marino next raises various objections to the Government's Version of the Offense. Marino contends that it was inappropriate for the government to submit its version of the offense during the course of Marino's presentence investigation since he has elected not to submit his version of the offense due to the expected appeal of his conviction and sentence.

However, Local Rule 2.06 E requires the government and defendant, should he choose to do so, to submit their versions of the offense to the probation office. Defendant's decision not to submit his version of the offense does not preclude the government from submitting its version of the offense to the probation officer. Moreover, this court agrees with the government that the submission of the respective versions of the offense "enables the Probation Office to make an accurate evaluation of a defendant's offenses,

---

**41.** For the same reasons, Marino also objects to the suggestion in the government's version of the offense that he was found guilty of intimidating and extorting Patrick Gervais and George Miller. For the reasons stated above, the government's version of the offense should be amended to reflect that Marino was found guilty of "intimi-

dating and attempting to extort or extorting" Gervais and Miller.

**42.** *See* Comments of Louis Marino on the Presentence Report, and Request for a Hearing, Appendix A.

their complexity, the defendant's role in the offense, his relative culpability, and most recently, the appropriate guidelines to be applied. It is inconceivable that a Probation Officer would be able to make an accurate and worthwhile assessment of a defendant and his offenses, and comply with the mandates of Rule 32(c)(2) of the Federal Rules of Criminal Procedure,[43] without receiving the government's and defendant's versions of the offenses (unless of course it is required that Probation Officers be assigned to defendants prior to trial and sit through every trial in its entirety."[44] The government's version of the offense is clearly marked as such and Marino has provided this court with no reason to believe that his probation officer did not understand that the document was only the government's version of the case. Therefore, Marino's objection to the inclusion of the government's version of the offense is overruled.

Marino also makes various vague objections to the government's version of the offense such as that it includes statements that were not proven at trial and that the government's explanation of crew supervision is not accurate. However, after reviewing the evidence, this court finds that the statements in the government's version of the offense regarding the supervisory activities of crew members have been adequately proven. In addition, the statements at issue are part of a document clearly marked as the government's version of the offense. As stated above, Marino has provided this court with no reason to believe that the probation officer has treated this document as anything but the government's version of the case. Therefore, Marino's general objections to the contents of the government's version of the offense are overruled.

### 1. Extortion of Thomas Skryd

Marino next argues that the government improperly informed the probation officer that Marino participated in the extortion of Thomas Skryd because this charge was stricken and Skryd was not called as a

witness by the government. As previously explained, it is well settled in this jurisdiction that relevant conduct can be considered for sentencing purposes. The Seventh Circuit has established that a court must increase a defendant's base offense level to account for "relevant conduct" which was part of the same course of conduct or common scheme as the convicted offense, regardless whether the defendant was charged with or convicted of carrying out those acts. *See Duarte,* 950 F.2d at 1263; *Franklin,* 902 F.2d at 504. To increase a defendant's offense level for uncharged or unconvicted activities, the court must find by a preponderance of the evidence that those activities were part of the same course of conduct as the convicted offense. *Duarte,* 950 F.2d at 1263.

As explained in the background section of this opinion, Skryd ran a money stakes poker game in the back of his tavern. After he had owned the bar for some time, Skryd was advised that the Chicago Outfit did not like the fact that he ran this poker game. Skryd was then introduced to Marino who insisted that he pay the crew a street tax for operating his card game. Marino also offered to provide Skryd with protection from the police and perhaps could give him some legal work to do for the crew. Rather than paying Marino, Skryd stopped the card game at his tavern. Skryd attested to this information in a written statement he made under oath. *See* Thomas Skryd Statement, Government Exhibit 1. In this written statement, Skryd also stated that he knew Marino to be connected with the Chicago mob and to be moving up in the mob's hierarchy. Skryd further stated that he stopped the card game because he wasn't charging for it and it was not worth the money he would be paying Marino. Skryd stated that he stopped the card game because he "did not want to have any dealings with Louis Marino" and that he "never considered having the card game without paying Marino. I understood that Marino was part of the Chicago Mob and I

---

**43.** Federal Rule of Criminal Procedure 32(c)(2) governs the investigation of and preparation of presentence investigation reports.

**44.** Government's Submission Concerning the Presentence Investigation Report for Louis Marino at 21.

was afraid of having any trouble with them."
*Id.*

Skryd's statements are corroborated by two recorded telephone conversations. On August 14, 1986, Infelise and Maltese, in pertinent part, had the following conversation:

Infelise: You know that guy, guy I told you to see that's got the place out in Lyons?

Maltese: Yeah.

Infelise: you didn't see him yet, did ya?

Maltese: No, ah, he was, ah, in Wisconsin.

Infelise: No.

Maltese: And due back about three.

Infelise: Ah, that's alright, don't see him.

Maltese: Oh, okay.

Infelise: Okay?

Maltese: Okay.

Infelise: Because ah ... our pal knows him.

Maltese: Huh?

Infelise: Our pal knows him real good, Louie.

Maltese: Yeah.

Infelise: I'd rather have it that way, you know.

Government Exhibit 205 at 1. Two hours after Infelise told Maltese that Marino would handle Skryd, Infelise had, in pertinent part, the following conversation with Marino:

Infelise: Get, you can get a hold of that guy in Lyons though ...

Marino: Huh?

Infelise: Get a hold of that guy, I told, ah, the other guy to forget about it.

Marino: Alright.

Infelise: Okay?

Marino: I'll get right on it.

Infelise: Alright.

Government Exhibit 206 at 3. Infelise's references to the "guy out in Lyons" adequately identify Skryd because Skryd's pub was located in Lyons, Illinois. Moreover, Infelise's direction to Marino to contact Skryd clearly supports Skryd's explanation of his association with Marino.

This court finds that Skryd's statement and these recorded conversations sufficiently demonstrate by a preponderance of the evidence that Marino was involved in Skryd's extortion. Moreover, it is clear that Skryd's extortion was part of the same course of conduct as charged in Count 1 of the indictment. The collection of street tax from individuals such as Skryd was an essential part of the RICO conspiracy of which Marino was convicted. Therefore, this court finds that, contrary to Marino's assertion, Skryd's extortion can be considered for sentencing purposes.

### 2. Extension of Juice Loan Bankroll to James Basile

■ Marino also objects to the government's contention that he provided a juice loan bankroll to James Basile because the government dropped this charge against Marino and did not present evidence about it at trial. As stated above, this court can consider relevant conduct at sentencing which has been proven by a preponderance of the evidence. *See Duarte,* 950 F.2d at 1263. After reviewing the evidence presented by the government, this court is persuaded that there is sufficient evidence to prove by a preponderance of the evidence that Marino had a juice loan relationship with Basile.

Defendant Michael Sarno, who admittedly made collections from Basile for Marino and Infelise, stated the following in his plea agreement:

[Sarno] understood from subsequent conversations with James "Duke" Basile, Marino, and Infelise that beginning in 1985 Basile was given several sums of money by Infelise and Marino to be used by Basile to finance "juice" loans to individuals. Basile was instructed to charge the "juice" customers interest at the rate of 5% a week. At the end of each month Basile was to turn in one half of the interest payments he collected to Marino and Infelise and keep the remaining half.

In the summer of 1986, Basile was instructed by Marino to pay future monthly juice payments to [Sarno]. From the summer of 1986 until June 1988 Basile made

monthly juice payments to [Sarno] at various locations. Beginning in early 1987 these monthly payments were tape recorded. [Sarno] understood that he was collecting monthly interest payment from Basile equal to 10% of the amount Basile owed to Infelise and Marino and that Basile was using the principal to make usurious loans at an interest rate of 5% per week which was more than twice the legally enforceable rate of interest.

By the summer of 1987, Basile owed $6500 to Infelise and Marino. On August 18, 1987, [Sarno] told Basile that Infelise wanted to meet with him. On August 24, 1987, [Sarno]. Basile, and Infelise met at the Cottage Restaurant in Berwyn, Illinois. At this meeting and in the presence of [Sarno], Infelise told Basile that he wanted the $6500 in juice loan money to be collected and turned in to Infelise and that Basile was free to do whatever he wanted as long as he turned in to Infelise part of what he earned.

On November 19, 1987, Basile repaid $3500 in principal to [Sarno]. Following the receipt of this money [Sarno] met with Infelise and turned the $3500 over to him. On June 14, 1988, Basile repaid the final $3000 in principal to [Sarno] who turned this money into Infelise.

It was the understanding of [Sarno], Basile and the individuals to whom Basile was to make these juice loans that the possibility existed that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of such debtors....

Plea Agreement of Michael Sarno at 4–5, ¶ 5(a). The accuracy of this statement is supported by several tape recorded conversations. For example, in the following June 14, 1988 recorded conversation, Basile repays Sarno part of the juice loan money and discusses repaying the remainder of the money he owes to Marino and Infelise:

Basile: Uh, here's the three thousand. That's three thousand (inaudible). Now, I, I gotta give you the juice for that. I just,

I finally captured this kid. I'm so glad to be rid of this prick....

\* \* \* \* \* \*

Sarno: But Rocky says there was still a figure of there was uh, okay, off the top of my head, I don't wanna make no mistakes, it was 95 at the top ...

Basile: Right. Yeah. Yeah. Yeah. Yeah.

Sarno: Okay. Okay he we made a deal for him for (inaudible).

Basile: That's where the "G" note is see he fucked me out of a "G" note but I mean it's my fault 'cause it's my mistake ...

\* \* \* \* \* \*

Basile: So, but anyway, he told me that uh, he talked to Rock and uh, whatever and tell him ... tell Rocky that I understand and, if you give me a couple more weeks and then I'll get the rest. At least I'm rid of this kid now. The other part's mine now. He owed me from football yet. He owes me thirty-one hundred from football. Plus what I got here. So that's what it was ... see ... I was ... I was hung up with ... with sixty-five for a long time so it was ninety-five, but he had an extra "G" note. 'Cause I had my fuckin' ... I had my money out too and that's what I did.

Sarno: Believe me, (inaudible).

Basile: Oh, no, no, there's no, no, you know what, when I look at it logically, it's my responsibility. It was mine.

Sarno: Yeah.

Basile: If it gave it to somebody else got nothing to do with ah, Rocky.

Sarno: Well.

Basile: *Louie's right. Him ... him and Louie gave me the money, I should fuckin' uh, be responsible. Uh, it's only two chunks.*

Government Exhibit 1039 at 1–3. Since this evidence adequately proves that Marino extended a juice loan bankroll to Basile, defendant's objection to the government's statements regarding Marino's relationship with Basile is overruled.

 Marino next objects to the following statement in the government's version of the offense:

In 1977, Robert Cooley fixed a murder trial for a crew member harry Aleman. On the instructions of Pat Marcy, Cooley paid $10,000 to Presiding Judge Frank Wilson to fix the case, and Aleman was subsequently acquitted in a bench trial. Cooley received the $10,000 from Pat Marcy which he paid to Wilson. Prior to the trial, Cooley met with Aleman and discussed the payment of the bribe to Wilson.

Government's Overview of the Offense at 18. Marino argues that Cooley was never called as a witness in this case and no evidence was presented to support the government's claims. Contrary to Marino's assertion, evidence was introduced at trial regarding Marcy's role in fixing a murder case for the crew. Jahoda testified at trial that on September 1, 1989, he travelled to Lake Geneva with Infelise to meet with undercover agent Larry Kaiser. En route, Infelise called Marcy on his mobile telephone. Immediately thereafter, Infelise discussed crew attempts to bribe judges in Jahoda's case and Marcy's involvement in the disputed bribe:

> Infelise: Me, I don't want favors, B. I'd rather give him this [money to fix the case] and say it's going to be done. And you know it's going to be done and you don't owe a fucking thing, and this way they can't turn around, we tried, but we couldn't do it, you know what I mean?
>
> Jahoda: Yeah, just pay your own way and pay a fair price.
>
> Infelise: Like when that kid had that murder case, me and Joe [Ferriola] came home and put up 50,000, 25 a piece. Some kid . . .
>
> Jahoda: Oh.
>
> Infelise: He's away. Now in my day the guy with the loot, did what he had to do. Kicked 25 grand. He gave it to this guy, the guy I just talked to [Marcy], right? He brought it to the old man, cuz he thought that's where the stuff come from. He didn't know Joe and I put it up, you know.
>
> Jahoda: (Inaudible) . . . really widen the circle.
>
> Infelise: The old man said to Joe? He says, I used that 25. Joe didn't know what the fuck he's talking about. Joe said, what

25 you, that 25, you know, I used it. Now Joe told me, he says Rock, we got, we got twelve five back a piece.

> Jahoda: What a way.
>
> Infelise: Our friend used it, so we . . .
>
> Jahoda: Back to square one.
>
> Infelise: It's just like the other guy got it.
>
> Jahoda: What a fucking story. What route that money took.
>
> Infelise: Well, we never knew we got it anyway, you know what I mean? I didn't give a fuck, fuck it, once we put it up we lost it.
>
> Jahoda: Fuck, that was really remarkable of the judge to do that.

Government Exhibit 421 at 27–28. Jahoda's sworn testimony and this recorded conversation provide sufficient evidence to support the government's statements regarding Marcy and the bribery of the judge presided over Aleman's murder trial. Therefore Marino's objection to this statement is overruled.

▇▇▇ Marino also objects to the following statement in the government's version of the offense:

> Marcy's role in the Outfit was to attempt to fix criminal cases against Outfit members and associates by arranging the reassignment of the case to a corrupt judge. This was confirmed by both Cooley and Infelise. In a tape recorded conversation with Jahoda, Infelise related how he and Ferriola provided Marcy with $50,000 to fix another murder case.

Government's Overview of the Offense at 18. Marino argues that Cooley and Infelise never confirmed the disputed information in the government's version of the offense. Marino also questions whether there is a tape recorded conversation regarding Infelise and Ferriola providing Marcy with $50,000 to fix a murder case. As the recorded conversation described above clearly indicates, there is evidence which demonstrates that Infelise and Ferriola gave Marcy $50,000 to fix a murder case. See Government Exhibit 421 at 27–28. Jahoda also testified extensively regarding the efforts made to fix his case. This testimony was corroborated by recorded statements by Infelise and DeLaurentis.

For example, in pertinent part, the following conversation took place between Jahoda and DeLaurentis:

DeLaurentis: Now this other thing, you go to court the 30th?

Jahoda: Yeah.

DeLaurentis: Alright, the guy that's handling it for us is going out of town the 28th, but it's being taken care of. If it's taken care of and it goes the way we want it to go, 10,000 is what it's going to cost. But we got to see what happens first. They don't get the money in front. They get the money after we see it.

Jahoda: You just tell me how to take care of it, and it's done.

Government Exhibit 406 at 5; *see also* Government Exhibits 410–11, 415, 421, 435, 453. Such evidence adequately refutes Marino's contention that the government's statements in its version of the offense are nothing more than "unproved allegations." Therefore, Marino's objection to the inclusion of the disputed statements in the government's version of the offense is overruled.

### 3. Other Objections to the Government's Version of the Offense

██ Marino also objects to the following statements in the government's version of the offense:

Similarly, the crew had another problem account in the person of a bettor named Ray Cavanaugh. Jahoda testified that he was told by Michael Zitello, the bookmaker who Cavanaugh bet with, that he and MARINO confronted Cavanaugh at the Board of Trade where Cavanaugh worked. Burt Goldstein, also a bettor, saw this confrontation and told Jahoda that he thought MARINO was going to pitch Cavanaugh over the balcony at the Board of Trade. Jahoda testified that Cavanaugh paid up after MARINO and Zitello grabbed him.

Marino argues that these statements have not been properly substantiated because Jahoda, who testified about this matter at trial, only heard about it from Goldstein, Goldstein has denied witnessing such a confrontation, and Zitello has denied participating in such a confrontation.

This court has already determined that Marino shook up Cavanaugh when attempting to collect Cavanaugh's debt. Jahoda testified at trial that he was advised about this collection when it occurred. Jahoda's testimony is adequately corroborated by Zitello's explanation of the events surrounding the Cavanaugh collection in a tape recorded conversation with Jahoda. In this conversation, Zitello confirmed that he and Marino·physically confronted Cavanaugh at the Board of Trade. *See* Government Exhibit 402A at 1–3. Despite Goldstein's denial, such evidence is sufficient to prove by a preponderance of the evidence that Marino physically confronted Cavanaugh when collecting Cavanaugh's debt.

### I. Base offense Level for Racketeering Act 10

The government also objects to the probation officer's calculation for the offense level for Racketeering Act 10, the intimidation and attempted extortion or extortion of Patrick Gervais. The government contends that Marino should be assessed a two point enhancement for obstruction of justice pursuant to Section 3C1.1 Marino provided Gervais with police protection for his house of prostitution. This court has already determined that a Section 3C1.1 enhancement is warranted on this basis. Gervais paid $3,000 per month in street tax to cover the crew's interest and payoffs to individuals at the Lake County Sheriff's Department. Gervais testified at trial about these payments and the advance warnings of any raids or investigations of his house of prostitution that Marino and DeLaurentis promised he would receive. Gervais further testified that on one occasion he received such a warning. This testimony is corroborated by a recorded conversation between Gervais and DeLaurentis in which they discuss the warning Gervais had received. *See* Government Exhibit 315 at 9. Such evidence clearly demonstrates that Marino provided Gervais with police protection and advance warning of raids in an attempt to impede and obstruct the administration of justice in connection with the investigation and prosecution of the illegal activity. The addition of this two point enhancement pursuant to Section 3C1.1 brings

Marino's offense level for Racketeering Act 10 up to 24. Under Section 3D1.4, a unitizing enhancement would be required bringing Marino's overall offense level, prior to the addition of the upward departure, up to 29 as previously established by this court.

### J. *Relevant Conduct*

██ Finally, the government argues that the probation officer failed to include criminal conduct that was not specifically included in the indictment, but has been proven by the government in defendant's guideline calculations. As previously explained, Section 1B1.3 requires that all relevant conduct be used to determine the seriousness of a defendant's offenses under the guidelines. The Seventh Circuit has established that a defendant's guideline calculations should include any uncharged conduct, dismissed counts, and even conduct which resulted in acquittals which has been proven by a preponderance of the evidence and which is part of the same course of conduct or common scheme or plan as the offense of conviction. *Duarte,* 950 F.2d at 1263.

### 1. Extension of Juice Loan Bankroll to Dominic Basso

The government contends that pursuant to Section 1B1.3, Marino's participation in loan-sharking and police protection activity, including the extension of juice loans to Dominic Basso, and juice loan bankrolls to Mike Pascucci and James Nicholas, should be included in Marino's guideline calculations. This court finds that sufficient evidence has been presented to warrant including these offenses in Marino's guideline calculations. Basso was a bookmaker to whom Marino extended a juice loan. This is confirmed by the following September 1, 1989 recorded conversation between Infelise and Jahoda:

Infelise: Look at that kid that they says they got hooked up with Pete Rose, Dom Basso, whatever his name was.

Jahoda: Yeah, what was he doing? Just trying to get a baseball ticket or something.

Infelise: He met him in Tampa, Florida, you know, he never took, they got this kid booking 250,000. This kid never booked

over 20,000 on a weekend as long as I know him.

Jahoda: He's a ham and egger. I mean, he's in the business, out of the business. He has bad breaks and tough luck.

Infelise: Right. Right. He's always fucking, on the hard, B.

Jahoda: I don't know the kid.

Infelise: You know, he's not a bad guy, I don't know. I know him, but I don't have nothing in common with him. But I know Louie's got him on the hard.

Government Exhibit 421 at 22–23. Since such evidence proves by a preponderance of the evidence that Marino extended a juice loan to Basso and the extension of such juice loans was part of the same course of conduct as the RICO conspiracy charged in Count 1, this juice loan should be included in Marino's offense calculation. Pursuant to Section 2E1.1, the proper offense level for this activity is 20.

### 2. Extension of Juice Loan Bankroll to Mike Pascucci

Sufficient evidence has also been presented to prove by a preponderance of the evidence that Marino extended a juice loan bankroll to Pascucci. As previously discussed with respect to Marino's supervisory position in the crew, DeLaurentis and Salvatore Koritsaris had the following discussion on October 18, 1986 regarding the juice loan bankroll that Marino extended to Pascucci:

DeLaurentis: So, Joe says I got it from Mike. It's Mike? Who's the fuck told Mike to do anything in Lake County. he says well he's with Louie [Marino]. I said I don't give a fuck if he's Jesus Christ. You don't fuck and come here and give you money. I says and you're fucking lying because you told George to say to was for free, there was no interest. I mean Pete and you told him not to let me know about it. So I says you tell that fucking cousin of yours to call me. So he called me and I says "listen you bulldog motherfucker." See he's a real tough guy.

\* \* \* \* \* \*

DeLaurentis: I says "you bulldog mother fucker," I ever catch you in fuckin' Lake

County again I'll knock your mother fuckin' head off. He says 'well what about my money?' I says it's in my pocket. You wanna come and get it? He says well it ain't my money, it's Louie's. You want me to tell Louie that. I say you tell anybody the fuck you want. Okay. So now he's figuring me and Louie will get in a beef, right. So, ah, he calls B.J. [Jahoda] for help. So B.J. says, fuck I can't help you with Solly. What the fuck can I do with Solly. He say well I got to talk to somebody, so he says I'll have somebody else call you. So Rocky called already he says Mikey, I'm going to tell you for the last time, when Solly says shit, you fucking squat 'cause if I turn him loose, he will knock you fucking head off.' He says one word from, the only reason he didn't knock your fucking head off already, he says turban. He says he wanted to put a fucking turban on your head. You know what that is don't ya?

\* \* \* \* \* \*

Koritsaris: Is that right? Yeah, but did Louie, Louie know anything about it or he was just bullshitting?

DeLaurentis: No, Louie didn't know nothing about it.

Koritsaris: He was bullshitting?

DeLaurentis: Yeah. I mean Louie gives a, here like let's say I give you $5,000 to put out, I don't know who you are giving it to.

Koritsaris: Right. That's not ...

DeLaurentis: Yeah. Louie don't give a fuck. He owes Louie the money now. But Louie and me are the same people. You know what I mean?

Government Exhibit 327 at 1–3. Given that Marino's extension of a juice loan bankroll to Pascucci has been proven by a preponderance of the evidence and the extension of juice loan bankrolls was part of the same course of conduct as the RICO conspiracy charged in Count 1, this offense should be included in Marino's guideline calculation. Pursuant to Section 2E1.1, the base offense level for this offense is 20 and with a three point enhancement pursuant to Section 3B1.1(b) for Marino's supervisory role in maintaining this juice bankroll, Marino's offense level for this offense is 23.

### 3. Extension of Juice Loan Bankroll to James Nicholas

Sufficient evidence has also been presented to prove by a preponderance of the evidence that Marino extended a juice loan bankroll to Nicholas. For example, Jahoda testified at trial as follows:

Q Mr. Nicholas got out of jail in 1987?

A Correct.

Q Was that on the contempt time that he was doing?

A Yes, that's correct.

Q Now, when he got out of jail, did you learn whether he had any relationship with Mr. Marino?

A Well, he had a professional relationship with Marino at this time. Jimmy had mentioned to me on many times he had to settle up the other business, which was referring to the juice business, with Louie.

(Tr. 843, December 18, 1991 9:45 a.m.). Jahoda's testimony is corroborated by the following October 18, 1989 conversation between Jahoda and DeLaurentis:

Jahoda: Plus this other, and I can't think of another word, I don't know, rivalry's the wrong word, but just, Jimmy [Nicholas] wants a bigger piece of the pie.

DeLaurentis: Well, Jimmy's got hot nuts, you know. He's got a ...

Jahoda: Yeah, but he's doing dead wrong.

DeLaurentis: Between you and me now.

Jahoda: I know he does. But he's so dead wrong. he's so out of line. But I can't talk to him.

DeLaurentis: He thinks he's going to set the world on fire now that he got an OK, you know what I'm saying? It'll come done. It'll come down in the long run.

Jahoda: Well, one thing that would look dumb down the road, is that we got the same dealers at the same game, but there ain't nobody else that I know of, so I mean, I don't mind, I don't mind that at all.

DeLaurentis: See, I can't interfere with that too much, because he's Louie's, you know what I mean?

Jahoda: I know. I know.

DeLaurentis: Like Louie can't fuck with you. You know it's the same thing.

Government Exhibit 444 at 26–27. This evidence is further corroborated by the following conversation between Infelise and Marino:

Infelise: But, uh, Saturday.

Marino: Yeah.

Infelise: Jimmy the Greek [Nicholas].

Marino: Yeah.

Infelise: He's got to give us 1,500 every Saturday. It's a special deal, he, he needed three 0 large. You know what I mean?

Marino: Oh yeah.

Government Exhibit 112 at 1.

Since this evidence proves by a preponderance of the evidence that Marino extended a juice bankroll to Nicholas and the extension of such juice bankrolls was part of the same course of conduct as the RICO conspiracy charged in Count 1, this activity should be included in Marino's offense calculation. Pursuant to Section 2E1.1, the proper offense level for this activity is 20 and with a three point enhancement pursuant to Section 3B1.1(b) for Marino's supervisory role in maintaining this juice bankroll, Marino's offense level for this offense is 23.

**K.** *Summary*

In sum, this court finds that Marino's total adjusted offense level is 43, his criminal history category is I, and his guideline sentence is life in prison. Since none of the counts for which Marino was convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts to best effectuate this sentence.

### Conclusion

For the reasons stated above, this court finds that Marino's adjusted offense level is 43 and his criminal history is IV, and his guideline sentence is life in prison. Since none of the counts for which Marino was convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts to best effectuate this sentence.